# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARC HAZOUT, | § | |
| | § | |
| Defendant Below-Appellant, | § | No. 353, 2015 |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| TSANG MUN TING, | § | |
| | § | C.A. No. N14C-12-067 |
| Plaintiff Below-Appellee. | § | |

Submitted: January 20, 2016
Decided: February 26, 2016

Before **STRINE**, Chief Justice; **HOLLAND** and **SEITZ**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

David L. Finger, Esquire (*Argued*), Finger & Slanina, LLC, Wilmington, Delaware, for Appellant.

M. Duncan Grant, Esquire (*Argued*), Christopher B. Chuff, Esquire, Pepper Hamilton LLP, Wilmington, Delaware; Alan Howard, Esquire, Jared Levine, Esquire, Crowell & Moring LLP, New York, New York, for Appellee.

**STRINE**, Chief Justice:

# I. INTRODUCTION

The plain language of § 3114(b) of Title 10 states that a nonresident officer of a Delaware corporation, by virtue of accepting and holding office, has consented to the exercise of personal jurisdiction over him in the Delaware courts in two classes of cases: (i) "all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary or proper party"; or (ii) "any action or proceeding against such officer for violation of a duty in such capacity."[1] This case involves a straightforward application of that language.

Here, Marc Hazout—a Canadian resident who is the President, CEO, Principal Financial and Accounting Officer, and a director of a Delaware corporation, Silver Dragon Resources, Inc.—has been sued for acts taken in his official capacity on behalf of a Delaware corporation based in Canada. As alleged in the complaint, Hazout was the lead negotiator for Silver Dragon in negotiating a capital infusion from a group of affiliated investors including Tsang Mun Ting and other residents of Hong Kong (the "Investor Group"). That capital infusion when consummated would have required a change of control of Silver Dragon from Hazout and certain others to Tsang and his fellow investors, who would have achieved the right to control Silver Dragon's board. The capital infusion was to be

---

[1] 10 *Del. C.* § 3114(b).

1

consummated by way of a series of agreements, four of which specified that Delaware law was to govern their terms, with one of those four agreements further providing that any dispute over it was to be litigated in Delaware. We shall refer to the interrelated set of agreements as the "Change of Control Agreements." The primary agreement provided that the Investor Group would lend Silver Dragon $3.4 million, subject to certain conditions, including a security interest in all of Silver Dragon's assets and the resignation of four directors. We will call that agreement the "Loan and Board Replacement Agreement." When all terms were negotiated and the Change of Control Agreements were ready to be inked, Tsang pushed send on the first $1 million of the $3.4 million in capital to be infused, based on his assurance that Hazout and the other directors of Silver Dragon would soon execute the Loan and Board Replacement Agreement. Hazout and two other Silver Dragon directors did sign the Loan and Board Replacement Agreement, but a fourth refused. Rather than return the $1 million to Tsang, however, Hazout not only caused Silver Dragon to keep it, but also had Silver Dragon send $750,000 of it to Travellers International, Inc., a corporation that Hazout controlled.

Tsang therefore brought this suit in the Superior Court of Delaware against Silver Dragon, Hazout, and Travellers for unjust enrichment, fraud, and fraudulent transfer in violation of the Delaware Uniform Fraudulent Transfer Act. Hazout moved to dismiss on the ground that there was no basis for the exercise of personal

2

jurisdiction over him in Delaware because Tsang was not suing Hazout as a stockholder of Silver Dragon for breach of any fiduciary or other duty owed to Silver Dragon as an entity or Tsang as a stockholder. The Superior Court disagreed and found that § 3114(b) provided a proper basis for personal jurisdiction.[2] We accepted a certified interlocutory appeal on the personal jurisdiction question from the Superior Court.

In this decision, we affirm. Under the clear language of § 3114(b), this is a "civil action[]" against the Delaware corporation of which Hazout was an officer and director, and Hazout is a "proper party" to that action because he has a legal interest in the dispute that is separate from Silver Dragon's interest, and because Tsang's claims against him arise out of the same facts and occurrences as the claims against Silver Dragon and it serves judicial economy to consider those claims together.[3] Here, as the Superior Court found, all of the claims against Hazout arise out of actions taken in his official capacity, and they include using his authority as a Silver Dragon fiduciary to cause funds paid to Silver Dragon by Tsang to be not only retained by it, but also to be transferred to Hazout's own affiliated company. Thus, there is no rational argument that the terms of § 3114(b) are not satisfied.

---

[2] *Tsang Mun Ting v. Silver Dragon Res., Inc.*, 2015 WL 3551871, at *4 (Del. Super. June 3, 2015).

[3] *See* 10 *Del. C.* § 3114(b); 67A C.J.S. *Parties* § 2 (2015); *Party*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Hazout, however, argues that the provision of § 3114 that applies to civil actions brought in this state against a corporation in which such director and officer is a necessary or proper party (the "Necessary or Proper Party Provision") was read out of the statute by the Court of Chancery in *Hana Ranch, Inc. v. Lent*,[4] and that the only operative provision of § 3114 is the one dealing with actions against a director and officer "for violation of a duty in such capacity"[5] (the "Internal Affairs Claim Provision"). Because Hazout is not being sued by Tsang for breach of a fiduciary or statutory duty owed to Sliver Dragon or Tsang as a stockholder, Hazout says that there is no basis for this state to exercise personal jurisdiction over him.

We disagree with that argument. Contrary to Hazout, we do not believe that it is a proper role for the Judiciary to excise a clear category set forth in § 3114(b), simply because there might be cases where it is susceptible to an overly broad reach. We understand that a decision of the Court of Chancery issued many years ago took that approach, but this Court has never ruled on that approach and we do not embrace it. Rather, under settled principles of statutory interpretation, it is our obligation to give effect to the plain language of statutes to the extent we can do so without offending any supervening constitutional limits. As both Chancellor

---

[4] 424 A.2d 28 (Del. Ch. 1980).
[5] 10 *Del. C.* § 3114.

4

Allen[6] and Chancellor Chandler[7] pointed out, that can be done in the case of § 3114 by ensuring that any exercise of personal jurisdiction under the statute is also consistent with due process, by applying the established minimum contacts test from *International Shoe* and its progeny.[8]

Here, that test is easily satisfied because the issues at the heart of this case involve Hazout's conduct in retaining and then diverting $1 million that Silver Dragon obtained control over in the course of negotiating and coming to near-closure on the Change of Control Agreements, which included four agreements that provided for the application of Delaware law, one of which also stated that "[a]ny dispute or cause of action arising hereunder shall be litigated in the State or Federal courts situated in the State of Delaware"[9] and that involved a contract that would have transferred control of a Delaware corporation from its current controllers to the Investor Group. The geography of where Hazout, as the lead operative for Silver Dragon, and Tsang, as the lead investor, were located when they negotiated the transaction, was not the focus of their shared interaction.

---

[6] *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 53 (Del. Ch. 1991) ("An alternative approach [to reading the 'necessary or proper' provision of § 3114 out of the statute] might have been to give the legislature's word its ordinary meaning, but to protect against unconstitutional use of the statute on a case-by-case basis—employing the test of the *International Shoe* line of cases to do so.").

[7] *See Ryan v. Gifford*, 935 A.2d 258, 269 n.24 (Del. Ch. 2007) (agreeing with the approach suggested by Chancellor Allen in *In re USACafes*).

[8] *See Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957).

[9] App. to Answering Br. at 47 (Line of Credit Loan Agreement at 7 (Section 9 (Governing Law))).

5

Rather, the key expectancies for all concerned were focused on Delaware, both as reflected in the precise terms of the Agreements they were negotiating, and the main focus of the Loan and Board Replacement Agreement, under which control over the governance of a Delaware corporation would pass in return for a major capital infusion. Because of these facts and the reality that all of Hazout's actions relevant to the suit could not have been accomplished without the power of his offices in a Delaware corporation, there is no due process problem in exercising personal jurisdiction over Hazout.

Furthermore, we also recognize that in crafting § 3114, the General Assembly included a safeguard against overreaching, because a nonresident officer and director can only be served in a case in which the corporation itself is a party, and in which the officer and director is a necessary or proper party to that suit. By that means, the statute requires that there be a close nexus between the claims against the corporation and those against the officer and director, and that the claims against the officer and director involve conduct taken in his official corporate capacity. In other words, this safeguard ensures that the implied consent mechanism of § 3114 only applies when a director or officer faces claims that arise out of his exercise of his corporate powers.

Finally, we note that the ability of a defendant to move for dismissal on *forum non conveniens* grounds provides an additional tool to ensure that officers

6

and directors are not subjected to suit in Delaware in a way that is unduly burdensome. Our precedent makes clear that even Delaware corporations can avoid facing suit in Delaware, where the connection between the claims at issue and Delaware are attenuated and the defendant corporation faces an undue burden.[10] That avenue for relief is also open to nonresident officers and directors.

Accordingly, we affirm the Superior Court's judgment denying Hazout's motion to dismiss claims against him for lack of personal jurisdiction.

## II. THE BUSINESS DEALINGS THAT FRAME THE PERSONAL JURISDICTION QUESTION[11]

As the introduction makes clear, this appeal turns on the interpretation of a statute, and whether personal jurisdiction can be exercised over Hazout, either because he: (i) is a "necessary or proper party" to an action against the corporation; or (ii) violated a statutory or fiduciary duty in his capacity as a director and officer.[12] And as we shall further see, the reason this appeal has been certified from our Superior Court is because the claims against Hazout, although arising entirely out of acts he took in his corporate capacity as the President and CEO, and a director of a Delaware corporation, are commercial in nature and brought by an arm's-length bargaining partner, Tsang. Although Tsang was a stockholder of the

---

[10] *See, e.g.*, *Martinez v. E.I. DuPont de Nemours & Co., Inc.*, 86 A.3d 1102 (Del. 2014).
[11] Because of the procedural posture, we principally rely on the version of events set forth in Tsang's complaint and therefore relied upon by the Superior Court in addressing the motion to dismiss for lack of personal jurisdiction.
[12] 10 *Del. C.* § 3114.

Delaware corporation, the claims he seeks to press do not involve claims for breach of fiduciary duty for harm done to the corporation and therefore indirectly to him as a stockholder. Rather, Tsang plainly alleges that Hazout and Silver Dragon itself defrauded him, stole his funds, and will not return them.

Because this is a personal jurisdiction case, geography remains germane, despite its waning relevance in many aspects of commerce. The defendant-appellant, Hazout, resides in Toronto, Canada. He serves as a director and as the President, CEO, and Principal Financial and Accounting Officer of Silver Dragon. For its part, Silver Dragon is a Delaware corporation whose principal place of business is in Toronto. Silver Dragon is a public mining and metals company that focuses on the acquisition, exploration, development, and operation of silver mines. At the time of the negotiations that gave rise to this dispute, Silver Dragon's shares were not traded on a stock exchange or on the pink sheets.[13]

Hazout is also the sole owner of one of Silver Dragon's creditors and largest stockholders, Travellers, a private investment bank incorporated in Ontario that also has its principal place of business in Toronto. Hazout is Travellers's President

___

[13] *See* Silver Dragon Res., Inc., Annual Report (Form 10-K), at 39 (Mar. 31, 2014) [hereinafter Silver Dragon 2013 Form 10-K] ("Our Common Stock is quoted on the Over-the-Counter Grey market."). As of July 21, 2014, Silver Dragon's common stock began trading on OTC Market Group's OTCQB marketplace, which is for companies that are in their development stage. *See* Silver Dragon Res., Inc., Annual Report (Form 10-K), at 23 (Mar. 27, 2015). We take judicial notice of Silver Dragon's public filings.

8

and CEO. Silver Dragon and Travellers were also named as defendants in this action, but are not parties to this appeal. There are different reasons for that. Because Silver Dragon is a Delaware corporation, it had no basis to contest jurisdiction in Delaware. By contrast, Travellers is a Canadian corporation and Tsang was unable to identify any act in Delaware relevant to the case that would justify the exercise of personal jurisdiction over Travellers in Delaware under our state's long-arm statute, 10 *Del. C.* § 3104. For that reason, Travellers's motion to dismiss for lack of personal jurisdiction was granted.

The plaintiff-appellee, Tsang, resides in Hong Kong and specializes in global investments and financial transactions. The other members of the Investor Group also reside in Hong Kong.

The unusual last acts that gave rise to this lawsuit arose out of a fairly common situation in the life cycle of a corporation. It appears that in 2012, Silver Dragon was having trouble meeting its financial obligations and moving forward with its business plans because of a lack of cash.[14] Negotiations therefore ensued between Hazout, on behalf of Silver Dragon and its board, and Tsang and the Investor Group, over the terms under which the Investor Group would make a substantial capital infusion into Silver Dragon. Although Silver Dragon is

---

[14] *See* Silver Dragon Res., Inc., Annual Report (Form 10-K), at 47 (Apr. 26, 2013) ("Our current level of cash is significantly insufficient to satisfy our current debt obligations and to fund our business as currently planned for 12 months. We will need significant additional funds to satisfy such obligations and to continue operations, which we may not be able to obtain.").

9

putatively a public corporation, it had a less-than-Godzilla enterprise value more characteristic of a very early stage business.[15] The parties therefore were discussing an infusion of millions of dollars, but deemed that level of contribution so material that the infusion would result in a transfer of corporate control to the Investor Group.

By late December 2013, the parties memorialized the terms of the Change of Control Agreements in which the Investor Group would lend Silver Dragon $3,417,265, and receive a security interest in all of Silver Dragon's assets. This recapitalization would allow Silver Dragon to pay its existing creditors and move forward with its business plans. But, in exchange for this infusion, the Investor Group would secure control over Silver Dragon's board, because four of the five members of Silver Dragon's board, including Hazout, were required to resign, and be replaced by designees chosen by the Investor Group. Hazout was also required to give up his position as an officer of Silver Dragon. The terms of the Change of Control Agreements were negotiated and finalized. These Agreements included: (a) the Loan and Board Replacement Agreement; (b) a Line of Credit Loan Agreement; (c) a Secured Line of Credit Note; (d) an Equity Interest Pledge and All Asset Security and Agreement; and (e) a Warrant for the Purchase of Shares of Common Stock of Silver Dragon. At least four of these five contracts contained a

---

[15] *See* Silver Dragon 2013 Form 10-K, at F-3.

10

Delaware choice-of-law provision.[16]  The Line of Credit Loan Agreement further provided that any disputes arising under the agreement would be litigated in Delaware courts.[17]  By year-end 2013, the Change of Control Agreements' terms were finalized and ready for execution.

Consistent with that, Hazout allegedly represented to Tsang and the Investor Group that the then-current directors would all sign the Loan and Board Replacement Agreement and resign on New Year's Eve, and that the deal would close that day.  Violating a fundamental playground rule of Yankee commerce, Tsang did not wait until all of the signed Agreements were in hand to send the

---

[16] App. to Answering Br. at 31 (Loan and Board Replacement Agreement at 9 (Section 5.6)):
> Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

*Id.* at 47 (Line of Credit Loan Agreement at 7 (Section 9)):
> Governing Law.  The validity, interpretation and performance of this Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to any conflict of law provisions or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.

*Id.* at 52 (Form of Secured Line of Credit Note at 3):
> This Credit Note is executed as a sealed instrument and shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to contracts to be performed wholly within such State.

*Id*. at 62 (Equity Interest Pledge and All Asset Security and Agreement at 8 (Section 7(g))):
> Choice of Law.  This Pledge Agreement shall be governed by and construed and enforced in accordance with the laws of the state of Delaware, except to the extent that the validity or perfection of the security interests hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the state of Delaware.

The Warrant for the Purchase of Shares of Common Stock of Silver Dragon was not provided in the record.

[17] *See id.* at 47 (Line of Credit Loan Agreement at 7 (Section 9)) ("Governing Law.  . . . Any dispute or cause of action arising hereunder shall be litigated in the State or Federal courts situated in the State of Delaware.").

money. Instead, in alleged reliance on Hazout's assurances that all the necessary Silver Dragon signatures were forthcoming, Tsang caused the first installment of $1,014,140 under the Agreements to be wired to Silver Dragon on December 30, 2013.

The next day, Hazout forwarded to the Investor Group an email chain among Silver Dragon's board members, which indicated that the company had "received the first tranche of funds" and that it had "signed the attached Line of Credit Agreement, Line of Credit Note, and Equity Pledge."[18]   The written correspondence further provided that Silver Dragon "has also received approval from [directors] Glen MacMullin, Charles McAlpine and Marc Hazout" and that "[u]pon approval from Manuel Chan today and his funds advanced the transaction will close and all resignations will take effect as of this day December 31, 2013."[19]

Later that day, Silver Dragon's attorney informed the Investor Group's counsel that the company was still awaiting director Chan's signature. At the same time, Silver Dragon's attorney sent over Hazout's signatures to all of the Agreements on behalf of Silver Dragon, and Hazout's signatures on behalf of Travellers and another associated entity of Silver Dragon of which he is the President. Silver Dragon's attorney also sent over signatures to the Loan and

---

[18] App. to Opening Br. at 15 (Compl. ¶ 28) (internal quotation marks omitted).
[19] *Id.* (Compl. ¶ 29).

12

Board Replacement Agreement from three of the company's directors, including Hazout.

But then things went pear-shaped. Hazout and Silver Dragon told the Investor Group that Chan would not sign. But Hazout and Silver Dragon did not send back the Investor Group's money. Rather, on April Fools' Day 2014, they told Tsang that Silver Dragon had already spent a quarter of the million dollars to pay off debts, and they weren't joking.

Three days later, the defendants further informed Tsang that Hazout and Silver Dragon transferred approximately $750,000 of the payment to Travellers. Between April and August of 2014, Tsang repeatedly asked Silver Dragon to give back the money, but Silver Dragon, Hazout, and his affiliate refused to return it.

To get the Investor Group's money back, Tsang filed a complaint in the Court of Chancery against Silver Dragon, Travellers, and Hazout. For purposes of understanding the current appeal, it is important to understand what claims Tsang made and did not make. In his complaint, Tsang alleged that Hazout and Silver Dragon (i) committed fraud against him and the Investor Group; (ii) were unjustly enriched by the Investor Group's $1,014,140 payment; and (iii) fraudulently transferred that payment to Hazout's affiliate in violation of the Delaware Uniform Fraudulent Transfer Act.

13

Notably absent from the complaint was any claim against Hazout for breach of fiduciary duty. The reason for that is rather plain: Tsang was not suing to protect Silver Dragon, or his stockholder investment in it. Tsang was suing Hazout, Silver Dragon, and Travellers to get the Investor Group's money back. Although it is conceivable that another Silver Dragon investor could sue Hazout over this alleged course of action,[20] Tsang did not do so, and his and the Investor Group's interests were adverse to Silver Dragon and make them unsuitable derivative plaintiffs. Consistent with Tsang's failure to allege a breach of fiduciary

---

[20] As the Superior Court noted, if the course of conduct Hazout engaged in transpired as Tsang alleges, his behavior would have serious fiduciary implications. *See Tsang*, 2015 WL 3551871, at *4. If, for example, he exposed Silver Dragon to liability to Tsang in order to facilitate improper payments to his own affiliates, such as Travellers, a claim by Silver Dragon to require Hazout to make it whole for any liability it incurred could be stated. Likewise, under Delaware law, a corporation cannot seek profit by using illegal means, and if Hazout knowingly did so and exposed Silver Dragon to liability, that would form a basis for a potential fiduciary duty claim by a derivative plaintiff whose interests were aligned with that of Silver Dragon. *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [or] where the fiduciary acts with the intent to violate applicable positive law . . . .'") (internal citation omitted); *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 889 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228, 2010 WL 5394004 (Del. 2010) (Table) ("[I]t is generally accepted that a derivative suit may be asserted by an innocent stockholder on behalf of a corporation against corporate fiduciaries who knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm."); *Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007) ("Delaware corporate law has long been clear on [the] notion [] that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct."); *see also* 8 *Del. C.* § 102(b)(7)(ii) (providing that an exculpatory charter provision cannot limit a director's personal monetary liability "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law").

14

duty claim, Tsang transferred his case to the Superior Court because it otherwise faced dismissal for lack of equity jurisdiction.

On January 7, 2015, Hazout and Travellers moved to dismiss the claims against them in the Superior Court for lack of personal jurisdiction. The Superior Court issued its opinion on June 3, 2015. In that opinion, the trial court granted Travellers's motion but denied Hazout's motion based on its finding that although Hazout was not subject to its jurisdiction under Delaware's long-arm statute,[21] jurisdiction over Hazout was proper under the officer consent statute.[22]

In its analysis, the Superior Court acknowledged the effect *Hana Ranch* had of limiting the application of § 3114 to suits that involve claims of breach of a corporate fiduciary's duty.[23] Being mindful of that constraint, the Superior Court strained to find jurisdiction over Hazout under the Internal Affairs Claim Provision.[24] Even though the trial court acknowledged that Tsang did not allege that Hazout breached a duty that he owed in his official capacity, it determined that "the alleged misconduct would be adverse to Hazout's fiduciary duty to Silver

---

[21] *See* 10 *Del. C.* § 3104.
[22] *Tsang*, 2015 WL 3551871, at *2–3.
[23] *Id.* at *3 (quoting *In re USACafes*, 600 A.2d at 52 (citing *Pestolite, Inc. v. Cordura Corp.*, 449 A.2d 269 (Del. Super. 1982); *Hana Ranch*, 424 A.2d 28)) ("It is true that earlier cases of Delaware courts have implied that it 'would be unconstitutional for Delaware to attempt to compel the appearance of directors here to litigate any claims other than claims for breach of their fiduciary duty to the corporation . . . .'").
[24] *Id.* at *4.

15

Dragon."[25]   The Superior Court also observed that "Hazout acted in his corporate capacity as Silver Dragon's Director, President, CEO and Principal Financial and Accounting Officer when he transferred the money to his company, Travellers."[26] On those grounds, the trial court determined that the Internal Affairs Claim Provision could be used to exercise jurisdiction over Hazout.[27]

In addressing whether its exercise of jurisdiction over Hazout comported with his rights to due process, the Superior Court adhered to established constitutional principles and determined that jurisdiction was constitutionally proper based on Hazout's contacts with Delaware.  In doing so, the Superior Court noted that "Hazout accepted certain duties under Delaware law"[28] when he accepted a position as Silver Dragon's fiduciary and that "this State has a public interest in enforcing these duties."[29]  It also observed that Tsang's claims arise out of alleged misconduct by Hazout in his capacity as a fiduciary of Silver Dragon, and concluded that it "is in keeping with traditional notions of fairness and substantial justice"[30] to require him to defend claims that arose out of his "management of the corporation."[31]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* (citing *Shaffer v. Heitner*, 433 U.S. 186, 222–24 (1977) (Brennan, J., concurring in part and dissenting in part)).
[31] *Id.*

16

After issuing its decision, the Superior Court certified Hazout's interlocutory appeal to this Court, which we accepted.

## III. ANALYSIS

We review the Superior Court's denial of Hazout's motion to dismiss the claims against him for lack of personal jurisdiction *de novo*.[32] We also conduct a *de novo* review of the Superior Court's interpretation of § 3114.[33]

At one level, this case is a rather simple one. As we shall discuss, this is plainly a suit in which Hazout is a "necessary or proper party" to a "civil action[] . . . brought in this State . . . against [the] corporation" of which he is an officer and director.[34] Not only that, we believe that given that Hazout was on notice that he had consented to suit in Delaware for certain classes of suits by virtue of his service as an officer and director of a Delaware corporation, the reality that the dealings that gave rise to this suit were focused on the change of control of that Delaware corporation, and that the parties to those dealings were clearly using Delaware law as their common language of commerce, Hazout has no basis to complain that his due process rights would be offended by Delaware's exercise of personal jurisdiction over him.

---

[32] *See AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005).
[33] *Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 652 (Del. 2006) ("Questions of statutory interpretation are questions of law reviewed *de novo*.").
[34] 10 *Del. C.* § 3114.

17

But, there is another level on which this suit is complex. In *Hana Ranch*, more than a generation ago, Chancellor Marvel essentially read the Necessary or Proper Party Provision out of the consent statute.[35] The former Chancellor did so on the ground that if he gave effect to that provision, it could be susceptible to an overbroad reach that could endanger the constitutionality of § 3114.[36] This fear was an understandable one, given the importance of § 3114 and its inspiration by *Shaffer v. Heitner*, a case that struck down the previous method that had been used to secure personal jurisdiction in Delaware over nonresident fiduciaries of Delaware corporations.[37]

On this appeal, Hazout's primary argument is that *Hana Ranch* is a sound interpretation of § 3114 and that it should be adopted by this Court. Although Hazout acknowledges that this Court has never had occasion to address whether *Hana Ranch* was correct, he notes that the Court of Chancery has adhered to it for years, despite the reality that two Chancellors have noted their view that it was not correctly decided.[38] In stressing *Hana Ranch*, Hazout acts consistently with his arguments below, where the shadow of that decision loomed over the Superior Court. The Superior Court rationalized its decision below as implicating the

---

[35] *See Hana Ranch*, 424 A.2d at 30–31.

[36] *See id.*; *see also* DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE & COMMERCIAL PRACTICE IN THE COURT OF CHANCERY § 3.04[a][2], at 3-55 (2013) (citing *Hana Ranch*, 424 A.2d at 30–31) (noting that "[t]he Chancellor [was] apparently fearful of the potential for unconstitutional application of the statute if read so broadly").

[37] *See* 433 U.S. at 216–17.

[38] *See supra* notes 6–7.

18

Internal Affairs Claim Provision on the grounds that although Hazout was not being accused in this suit of breaching duties he owed to Silver Dragon or its investors as a fiduciary, his conduct was taken in his official capacity and that allegations of the complaint could form the basis for a claim for breach of fiduciary duty by a disinterested Silver Dragon stockholder.

Hazout also emphasizes that *Hana Ranch* was preceded by this Court's decision in *Armstrong v. Pomerance*, which says: "[Section] 3114 authorizes jurisdiction only in actions which are inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary, i.e., the Delaware corporation."[39] He argues that this language—which was dictum because the case dealt with a garden-variety fiduciary duty claim that is grist for the mill of the Internal Affairs Claim Provision—somehow read the Necessary or Proper Party Provision out of the statute, at least as to claims not formally governed by Delaware law.

In addressing Hazout's arguments, Tsang counters that *Hana Ranch* is an erroneous interpretation of § 3114, which this Court has never had occasion to address. Pointing to the plain language of § 3114, Tsang argues that *Hana Ranch* involved a judicial determination to excise a plain provision of a carefully crafted statute, a determination that goes beyond the proper judicial role. Not only that,

---

[39] 423 A.2d 174, 176 n.5 (Del. 1980).

Tsang contends that it is unnecessary to strike any provision of § 3114 to preserve its constitutionality because § 3114 alone cannot serve as an ultimate basis for the exercise of personal jurisdiction. Rather, in each case where § 3114 is used, it must also be consistent with principles of due process, as measured by the minimum contacts test of the *International Shoe* line of cases, to exercise personal jurisdiction over the nonresident defendant in Delaware. Alternatively, Tsang strains to contend that this is a suit that implicates the Internal Affairs Claim Provision, if we conclude that we should adopt the approach taken by *Hana Ranch*.

We approach the parties' contending arguments by focusing first on their primary clash, which is over whether the Necessary or Proper Party Provision is still viable. Settled principles of statutory determination are critical to our resolution of that dust-up and, to our mind, compel the conclusion we reach.

In interpreting any statute, we "ascertain and give effect to the intent of the legislature."[40] Where the statute is unambiguous, we must adhere to the plain meaning of the statutory language.[41] Of special relevance to this case are the principles that guide courts in addressing statutes that may be susceptible to

---

[40] *Swier*, 900 A.2d at 652 (quoting *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985)) (internal quotation marks omitted); *see also Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999) (citing *Street v. State*, 669 A.2d 9, 13 (Del. 1995)) ("The goal of statutory construction is to determine and give effect to legislative intent.").

[41] *Eliason*, 733 A.2d at 946 ("If a statute is unambiguous, there is no need for judicial interpretation, and the plain meaning of the statutory language controls.") (internal citation omitted); *Coastal Barge Corp.*, 492 A.2d at 1245–46 ("If the statute as a whole is unambiguous, there is no reasonable doubt as to the meaning of the words used and the Court's role is then limited to an application of the literal meaning of the words.").

unconstitutional application. In those cases, courts should avoid interpretations that would render a statute unconstitutional, if that can be done without impairing the legislature's purpose.[42] But, courts are not authorized to strike provisions of a statute simply because that will make it easier for the Judiciary to apply the statute in the future without challenges to its constitutionality, as applied in particular cases.[43] As-applied challenges are well-understood, and striking a provision by

---

[42] *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 515 (1964)) (noting that although a court "will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it") (internal quotation marks omitted); *United States v. Locke*, 471 U.S. 84, 96 (1985) (quoting *Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933)) ("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question."); *Wash. Mkt. Co. v. Hoffman*, 101 U.S. 112, 115–16 (1879) ("We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. . . . '[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times."); *Richardson v. Wile*, 535 A.2d 1346, 1350 (Del. 1988) (citing *Atlantis I Condo. Ass'n v. Bryson*, 403 A.2d 711 (Del. 1979)) ("[W]here a possible infringement of a constitutional guarantee exists, the interpreting court should strive to construe the legislative intent so as to avoid unnecessary constitutional infirmities."); *Sturgill v. M & M, Inc.*, 329 A.2d 360, 362 (Del. 1974) ("Our duty is to read statutory language so as to avoid constitutional questionability and patent absurdity and to give the language a reasonable and suitable meaning.") (internal citation omitted); *State v. Baker*, 679 A.2d 1002, 1007 (Del. Super. 1996) (citing *Snell v. Eng'd Sys. & Designs, Inc.*, 669 A.2d 13, 20 (Del. 1995)) ("If possible to do so, statutes must be construed to achieve a common sense result, a result which is in harmony with constitutional principles, and to avoid a construction which would lead to unreasonable or absurd results."); *see also* 82 C.J.S. *Statutes* § 395 (2009) (internal citations omitted) ("The primary duty of a court in interpreting a statute is to ascertain and give effect to the intention and purpose of the legislature. The fundamental rule of statutory construction to which all other rules are subordinate is that the court must ascertain and implement the legislative intent, as expressed in the statute, unless it is in conflict with constitutional provisions.").

[43] *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.") (internal citation omitted); *United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of

judicial fiat is something that should result from a facial challenge to the validity of a statute. Consistent with this principle, it is also understood that blanket judicial invalidation of a statute's words should not ensue if the statute can be applied constitutionally in a wide class of cases, but might operate overbroadly in some more limited class of cases.[44]

These established principles of jurisprudence lead us to conclude that we cannot embrace the approach taken by *Hana Ranch*. We recognize the high-minded motivation that impelled that ruling, but we cannot square it with

pronouncing [a legislative act] unconstitutional is not to be exercised with reference to hypothetical cases thus imagined. . . . [A] limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were in fact concretely presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy."); *see also Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 948–49 (Del. Ch. 2013) ("The plaintiffs' burden on this motion [for judgment on the pleadings] challenging the facial statutory and contractual validity of the bylaws is a difficult one: they must show that the bylaws cannot operate lawfully or equitably *under any circumstances. . . .* The plaintiffs voluntarily assumed this burden by making a facial validity challenge, and cannot satisfy it by pointing to some future hypothetical application of the bylaws that might be impermissible. The answer to the possibility that a statutorily and contractually valid bylaw may operate inequitably in a particular scenario is for the party facing a concrete situation to challenge the case-specific application of the bylaw . . . .") (internal citations omitted) (emphasis in original); 16 C.J.S. *Constitutional Law* § 163 (2015), Westlaw (updated December 2015) ("In an as-applied challenge to the constitutionality of a law, a court assesses the merits of the challenge by considering the facts of the particular case, not hypothetical facts in other situations; under such a challenge, the challenger must show that his or her constitutional rights were actually violated. . . . On a facial challenge to the constitutionality of a law, the court must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases.").

[44] *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("The fact that [an act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.") (internal citation omitted); *Parker v. Levy*, 417 U.S. 733, 760 (1974) ("This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied.").

22

what we understand to be our duty in giving effect to our General Assembly's enactments. When confronting *Hana Ranch* as precedent in *In re USACafes, L.P. Litigation*, Chancellor Allen recognized the problematic nature of *Hana Ranch*'s approach.[45] In that decision, Chancellor Allen noted that the possible unconstitutional application of the Necessary or Proper Party Provision could be dealt with by the requirement to ensure that any exercise of personal jurisdiction under a Delaware service of process statute—be it § 3114 or the long-arm statute— be consistent with constitutional principles of due process.[46] Feeling bound as a trial judge to adhere to the precedent of his own court,[47] Chancellor Allen did not depart from *Hana Ranch*, and instead concluded that jurisdiction was proper under the Internal Affairs Claim Provision because the defendant directors violated the duty of loyalty that they owed to the partnership and its limited partners in their capacity as corporate fiduciaries.[48] In a later case, Chancellor Chandler also adhered to *Hana Ranch*,[49] but signaled his agreement with Chancellor Allen that the better approach to interpretation was to give effect to the Necessary or Proper

---

[45] *See* 600 A.2d at 53.
[46] *See supra* note 6.
[47] *See In re USACafes*, 600 A.2d at 53 (noting that "[t]he doctrine of *stare decisis*" removed the option of hewing to the plain language of the Necessary and Proper Party Provision and applying the minimum contacts analysis to guard against unconstitutional application of that provision).
[48] *See id.*
[49] *Gifford*, 935 A.2d at 269 ("I am duty bound to follow the law as it is currently interpreted . . . .").

23

Party Provision, and to use the minimum contacts test to police any overbreadth.[50]

Candor requires us to acknowledge that Hazout is correct in pointing out that the Court of Chancery has adhered to *Hana Ranch*,[51] although Hazout is unable to identify a case when the Court of Chancery was actually faced with the precise argument that Tsang now makes and where resolution of the jurisdictional question turned on whether the Necessary or Proper Party Provision was still viable.

As important, Hazout admits that this Court has never been presented with this question before. In our prior decisions involving § 3114, we assumed that the General Assembly intended there to be two categories of cases to which directors and officers had consented to service.[52] We did that for the obvious reason that the

---

[50] *See id.* at 269 n.24.

[51] *See, e.g.*, *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *10 (Del. Ch. Apr. 10, 2008) (internal citations omitted):

> Section 3114, despite its broad language, has been interpreted over the last quarter-century to be limited to granting personal jurisdiction only for claims against directors in their capacity as directors. Moreover, case law has interpreted § 3114 as applying only in suits brought by a stockholder directly or by or on behalf of the corporation itself involving violations of the Delaware General Corporation Law (the "DGCL"), the corporate charter and bylaws, and breaches of the fiduciary duties owed to the corporation and its stockholders (i.e., "Corporate Claims"). Those interpretations of the director consent subsection of § 3114 also apply to the officer consent subsection of § 3114.

But, the argument in *Corporate Property Associates* was not based on the Necessary or Proper Party Provision but rather on the argument that "if a complaint contained a plausible, but still dismissable, Corporate Claim against a director served under § 3114, other claims related to the facts giving rise to the unsuccessful Corporate Claim, if viable, could be prosecuted against the director in this court." *Id.* (internal citation omitted).

[52] *See, e.g.*, *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 227–28 (Del. 1982) ("Service on a director pursuant to [§ 3114] is only contemplated in actions 'in which such director, trustee or member is a necessary or proper party, *or* in any action or proceeding against such director, trustee or member for violation of his duty in such capacity, whether or not he continues to serve as such director, trustee or member at the time suit is commenced.'") (internal

24

Necessary or Proper Party Provision and the Internal Affairs Claim Provision are separated by the word "or" and that there is no other reasonable reading that can be given to the statute.[53] In none of our cases did we assume that the Necessary or Proper Party Provision was invalid.

In noting that we have never decided the question before us, we do not ignore Hazout's citation to dictum in *Armstrong*. But that dictum is just that, and its focus is on precisely the kind of factors that properly are taken into account in the application of the minimum contacts test. In this case, as we discuss, the conduct underlying all the claims was in fact Delaware-focused and involved parties using Delaware law as their language of commerce in negotiating the change of control of a Delaware corporation. We need not make a choice-of-law analysis at this juncture to conclude that this is a case in which Delaware has a legitimate interest in providing a forum for efficient redress of claims against a Delaware corporation and the fiduciary whose actions are at the heart of those claims.

Additionally, we are unable to find any proper basis now for determining that the Necessary or Proper Party Provision is facially invalid, as Hazout would

citations omitted) (emphasis added); *Armstrong*, 423 A.2d at 176 n.5 ("We emphasize here that [§] 3114 authorizes service only in actions where directors, trustees or members of the governing body of a Delaware corporation are necessary or proper parties *or* where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to the corporation and its owners.") (emphasis added).
[53] *See* 10 *Del. C*. § 3114.

have us declare.[54]   Starting with the language of the Necessary or Proper Party Provision, we note that the provision contains its own safeguards against overbreadth.  By its plain terms, the Necessary or Proper Party Provision limits the exercise of jurisdiction over a nonresident director or officer to cases in which the corporation is a named party, and to which the corporate fiduciary is also a "necessary or proper party."[55]   Through this means, the General Assembly therefore required that there be a close nexus between the claims involving the corporation which made it a party to the suit, and the conduct of the nonresident fiduciary.

As a result, only claims that involve conduct by the nonresident fiduciary using his corporate power will make him a necessary or proper party.  In choosing the words "necessary or proper party," the General Assembly did not invent new terms.  Rather, they used terms that had a lineage in our tradition of law.  Courts have historically identified and included "necessary" parties to a suit on the ground that those parties have "rights which must be ascertained and settled before the rights of the parties to the suit can be determined."[56]  And "proper" parties appear

---

[54] *See, e.g.*, *Wash. State Grange*, 552 U.S. at 449 ("[A] facial challenge must fail where the statute has a 'plainly legitimate sweep.'") (internal citation omitted).

[55] 10 *Del. C.* § 3114.

[56] 67A C.J.S *Parties* § 3 (internal citations omitted); *see also id.* ("It is generally held that the necessary parties to a proceeding, regardless of its nature, that is, whether it is in rem, at law, or in equity, are those, and those only, who have an interest in the subject matter of the suit and whose rights may be materially affected or concluded by the judgment, and without whom the court will not proceed to a final determination of the controversy, even as between parties

26

before a court because they have a separable legal interest in the suit.[57]  We must give effect to the terms carefully selected by the General Assembly and presume that they intended to reflect the established meaning of those terms.[58]

Furthermore, by authorizing jurisdiction over corporate fiduciaries who use their position to commit wrongs on behalf of the corporation in actions where the corporation is properly before the court, the General Assembly could be thought to

---

properly before the court.") (internal citations omitted); *Party*, BLACK'S LAW DICTIONARY (defining a "necessary party" as "[a] party who, being closely connected to a lawsuit, should be included in the case if feasible, but whose absence will not require dismissal of the proceedings").

[57] *See, e.g.*, 67A C.J.S *Parties* § 2 ("A proper party to an action or proceeding is a party who has an interest in the controversy or subject matter which is separable from the interest of the other parties before the court so that it will not necessarily be affected by a decree which does complete justice between the other parties. . . .  A proper party is not the same as a necessary or indispensable party.  The term includes those without whom a substantial decree or judgment may be made but not a decree or judgment which will completely settle all the questions involved and conclude the rights of all persons who have any interest in the subject matter of the litigation.") (internal citations omitted); 59 AM. JUR. 2d *Parties* § 8 (2012) ("In every civil case, there must be a proper party plaintiff and a proper party defendant.  A 'proper party' is one whose interest may be affected by a judgment but whose presence is not essential for the adjudication of an action.  Only those persons who are legally affected are proper parties to a lawsuit.  A party is 'legally affected' by a cause of action, so as to be a proper party to the action, if the party has a legal interest in rights that are the subject matter of the cause of action.  All those having an interest in the subject matter of the litigation that may be conveniently settled therein are proper parties.") (internal citations omitted); *Party*, BLACK'S LAW DICTIONARY (defining a "proper party" as "[a] party who may be joined in a case for reasons of judicial economy but whose presence is not essential to the proceeding").

[58] *See, e.g.*, *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here [the legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.  In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."); 82 C.J.S. *Statutes* § 385 ("Courts presume that the legislature understood the meaning of the words that it used and that it intended to use them. . . .  [C]ourts presume that the words in a statute have been used . . . in their legal sense, if they have a well-settled legal meaning.") (internal citations omitted).

have had an interest in conserving litigant and judicial resources by enabling plaintiffs to seek redress against the corporation and the fiduciary for injuries in one, rather than multiple forums, for claims arising out of the same facts or occurrences. And because of the nexus requirement in the Necessary or Proper Party Provision, the General Assembly could easily have deemed it reasonable for nonresident fiduciaries to have consented to subjecting themselves to jurisdiction in the chartering states in cases where their conduct in their official corporate capacity renders them a necessary or proper party in a case to which the corporation is also a defendant. Moreover, § 3114 provided explicit notice to Hazout that, by accepting a position as a director and officer of a Delaware corporation, he consented to appear in this state to defend claims that fall under either the Necessary or Proper Party Provision or the Internal Affairs Claim Provision.[59]

Most important, although one can conceive of cases where applying the plain terms of the Necessary or Proper Party Provision might compromise a

---

[59] *See, e.g.*, *Armstrong*, 423 A.2d at 176 ("[The defendants'] status as directors and their power to act in that capacity arise exclusively under the Delaware corporation statutes. The defendants accepted their directorships with explicit statutory notice, via [§] 3114, that they could be haled into the Delaware Courts to answer for alleged breaches of the duties imposed on them by the very laws which empowered them to act in their corporate capacities."); *HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 306 (Del. Ch. 1999) ("[Section] 3114 is in the Delaware Code and provides clear notice to any reasonably informed director that accepting service as a director of a Delaware corporation brings with it an obligation to defend official capacity suits here. This fact is the underpinning of § 3114's constitutionality.").

nonresident fiduciary's due process rights,[60] it is equally easy to conceive of cases, such as this one, where Delaware's exercise of personal jurisdiction under the Necessary or Proper Party Provision would pose no constitutional difficulty. And, as Chancellors Allen and Chandler pointed out, the way to police that concern is to apply the method we do when implementing our state's long-arm statute, which is to give effect to its terms, and to use the minimum contacts analysis required by *International Shoe* to ensure that the statute is not used in a situationally inappropriate manner.[61]

Nor are principles of personal jurisdiction the only way to address the burden to nonresident fiduciaries of addressing litigation in our state. As we have recently pointed out, the doctrine of *forum non conveniens* remains a viable tool for even Delaware residents, including corporations, when sued on claims that have little connection to Delaware, where Delaware law is not at stake, and where

---

[60] For example, if plaintiffs attempted to drag corporate officers and directors into Delaware by naming them as defendants in a products liability case where the products had been designed and distributed from a state other than Delaware to diverse consumers, most of whom were in states other than Delaware, the minimum contacts test would provide substantial protection. It would be constitutionally questionable, to say the least, for Delaware to exercise personal jurisdiction when Delaware's status as the state of incorporation had no rational connection to the cause of action, where the conduct is governed by the laws of other states, and where there is no reason why a corporate fiduciary should expect to be named as a party at all, much less in a suit where the underlying conduct and claims have no rational connection to Delaware and provide no rational basis for Delaware to apply its own law. Not only that, the traditional protections of the corporate shield are unaffected by this decision, and there are serious limits on the ability of plaintiffs to use veil-piercing to hold corporate fiduciaries or stockholders financially responsible for actions of the corporation itself.

[61] *See supra* notes 6–8.

29

the burdens of defending the suit in Delaware are substantial and not justified by any legitimate interest of the plaintiff in suing in Delaware.[62]

Finally, we also note the value of following regular order in the interpretation of § 3114. That can be illustrated by the dilemma faced by our Superior Court in this case. Facing the uncertainty posed by *Hana Ranch*, the Superior Court purported to base its recommendation on the Internal Affairs Claim Provision, but in a case that did not involve any claim against Hazout involving a breach of a duty he owed to Silver Dragon or its stockholders as a fiduciary. Rather, the Superior Court posited that Hazout's conduct, if as alleged, could constitute not only a tort against Tsang and the Investor Group, but also a fiduciary breach against Silver Dragon and its stockholders (if a suit of that kind were brought by Silver Dragon or one of its disinterested stockholders later). To our minds, it is counterproductive to embrace *Hana Ranch* and then create an incentive to read the Internal Affairs Claim Provision overbroadly. Rather, the historical view of the Court of Chancery that the Internal Affairs Claim Provision addressed only claims against nonresident fiduciaries of Delaware corporations for internal affairs claims involving an argument that they breached statutory or fiduciary

---

[62] *See Martinez*, 86 A.3d at 1108–11 (affirming the Superior Court's dismissal of a foreign plaintiff's complaint based on the doctrine of *forum non conveniens* because the defendant corporation faced overwhelming hardship and inconvenience in having to defend a suit that involved complex and unsettled issues of foreign tort law where the plaintiff was not a Delaware resident and was not injured in Delaware, and the fact that the defendant corporation was incorporated in Delaware had no rational connection to the cause of action).

duties they owed to the corporation or its stockholders is the correct one dictated by the language of that provision.[63] In this case, Hazout is not being sued for having breached any duty he owed to Silver Dragon or its stockholders. He is being sued by Tsang for torts he allegedly committed against Tsang and the Investor Group in the course of negotiating on behalf of Silver Dragon and by using his powers at Silver Dragon to divert their funds to his affiliate.

If there is jurisdiction over Hazout under § 3114, it is under the Necessary or Proper Party Provision. Under the clear terms of that provision, Hazout is subject to service of process. Although he is not a necessary party to the case against Silver Dragon because the Superior Court can proceed to a final determination of the action with Silver Dragon alone,[64] Hazout is obviously a proper party because he has a tangible legal interest in the matter that is separate from Silver Dragon's interest, and because the claims against him arise out of the same facts and occurrences as the claims against Silver Dragon—alleged wrongs that Hazout

---

[63] It has long been the case, of course, that once a nonresident director or officer is properly subject to personal jurisdiction in Delaware for a claim for breach of fiduciary duty under the Internal Affairs Claim Provision, the trial court may also subject that fiduciary to personal jurisdiction for claims that are "sufficiently related" or "[not] distantly related" to the breach of fiduciary duty claim. *See, e.g.*, *In re USACafes*, 600 A.2d at 54 (observing that the court could exercise personal jurisdiction over "claims [that] arose from the same acts or transactions as [breach of fiduciary duty] claims between the same parties over which the court did have personal and subject matter jurisdiction," including claims that are not "distantly related to the alleged breach of fiduciary duty"); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *1 (Del. Ch. Sept. 1, 2006), *aff'd*, 930 A.2d 92 (Del. 2007) (explaining that a plaintiff may also succeed in obtaining jurisdiction over "claims [that] are adequately alleged to be 'sufficiently related' to a viable fiduciary duty claim").
[64] *See supra* note 56.

committed in his capacity as the company's President and CEO.[65]  Because that is

so and because we decline to excise the Necessary or Proper Party Provision from

the statute, § 3114 provides a proper statutory basis for the Superior Court to

exercise personal jurisdiction over him.

As we have indicated, that determination is not enough to affirm.  Rather,

we must examine whether the exercise of personal jurisdiction over Hazout in this

case is consistent with his constitutional expectations of due process.  As we have

noted, in this case, that is not in our view a close question.  By becoming a director

and officer of a Delaware corporation, Hazout purposefully availed himself of

certain duties and protections under our law.[66]  More important, the claims against

Hazout involve his actions in his official capacity of negotiating contracts that

involved the change of control of a Delaware public corporation.  By their plain

terms—which Hazout represented as final and which Hazout himself executed—

the Agreements reflected the parties' choice to use the law of Delaware as their

common language of commerce, and their understanding that litigation over later

---

[65] *See supra* note 57.

[66] *See Sternberg v. O'Neil*, 550 A.2d 1105, 1120 (Del. 1988) (citing *Burger King*, 471 U.S. at 475–76)) ("[T]he minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created continuing obligations between himself [] and the forum.  Consequently, his [] activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require him [] to submit to the forum's jurisdiction."); *Armstrong*, 423 A.2d at 176 ("[T]he defendants, by purposefully availing themselves of the privilege of becoming directors of a Delaware corporation, have thereby accepted significant benefits and protections under the laws of this State.").

32

contractual differences could ensue in Delaware.[67]  As to the claims in this case, therefore, there is a strong argument that all sides to the matter understood that as to the course of their respective actions relevant to this case, the jurisdiction that was their focus was the home of the fried oyster sandwich, and not the home of poutine or dim sum.  That Tsang happened to be in Hong Kong and Hazout in Canada was a matter of geography having little bearing on what was a cross-border transaction involving a change of control of a Delaware corporation and involving the negotiations of agreements using the language of Delaware.[68]  For these

---

[67] *Burger King*, 471 U.S. at 482 (observing that "[a]lthough [a choice-of-law] provision standing alone would be insufficient to confer jurisdiction," when combined with other meaningful contacts, "it reinforce[s] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); *World-Wide Volkswagen*, 444 U.S. at 297 ("[T]he foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.") (internal citations omitted); *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *12 (Del. Ch. Feb. 22, 2006) ("'The touchstone of this minimum contacts analysis is foreseeability—whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'") (internal citation omitted).

[68] In this regard, Hazout assumes with confidence that the tort claims at issue in this case are necessarily governed by either the law of Canada or the law of Hong Kong.  We do not believe that the Superior Court has ruled on that issue nor do we believe that Tsang has conceded that argument.  Under our law, the Superior Court will be bound to apply the most significant relationship test of the Restatement (Second) of Conflict of Laws.  Given the realities of the subject matter of the parties' discussions over the Change of Control Agreements and their choice of Delaware law as their common language of commerce, there is a non-trivial argument that Delaware has a greater interest in the application of its law to this case than either Canada or Hong Kong.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(c) (1971) (providing that "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue" are relevant to the choice-of-law analysis); *id.* § 145(1) (providing that certain contacts such as "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered . . . are to be evaluated according to their relative importance with respect to the particular issue."); *id.* § 6(2) cmt. f ("The forum should [] appraise the relative

33

reasons, Hazout cannot fairly say he did not foresee that he would be subject to litigation in Delaware over his conduct in connection with negotiating the Change of Control Agreements. Accordingly, requiring Hazout to defend Tsang's lawsuit in this state does not "offend traditional notions of fair play and substantial justice."[69]

## IV. CONCLUSION

Therefore, because § 3114 provides a statutory basis for personal jurisdiction over Hazout in Delaware, and because exercising that jurisdiction is consistent with Hazout's constitutional rights, we affirm the Superior Court's denial of Hazout's motion to dismiss.

---

interests of the states involved in the determination of the particular issue."); § 145 cmt. f (noting that "the place of injury is less significant in the case of fraudulent misrepresentations"); *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1049–50 (Del. Ch. 2006) (noting the diminished importance of a sophisticated buyer's physical location in determining choice of law as to a claim of intentional misrepresentations made by the seller in a negotiated agreement between the parties, "particularly when those relationships involve interstate commerce and do not center in any material manner on the geography of any particular party's operational headquarters"); *see also id.* at 1048 ("Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid. . . . To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote."). But that matter is not before us, and is one to be determined in the first instance by the Superior Court upon briefing by the parties.

[69] *Int'l Shoe*, 325 U.S. at 316 (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).