# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BAM INTERNATIONAL, LLC,  )
          )
   Plaintiff,     )
          )
  v.        )  C.A. No. 2021-0181-SG
          )
THE MSBA GROUP INC.,   )
MAMMOTH RX, INC., RYAN  )
HILTON, AMIR ASVADI, and  )
MILES STEPHEN BOWN,   )
          )
   Defendants.   )

## MEMORANDUM OPINION

Date Submitted: September 15, 2021
Date Decided: December 14, 2021

Karen E. Keller, Jeffrey T. Castellano, and Nathan R. Hoeschen, of SHAW KELLER LLP, Wilmington, Delaware, *Attorneys for Plaintiff BAM International, LLC.*

Kevin S. Mann, of CROSS & SIMON LLC, Wilmington, Delaware; OF COUNSEL: John J.E. Markham, II, of MARKHAM READ ZERNER, LLC, Boston, Massachusetts, *Attorneys for Defendants Amir Asvadi, Ryan Hilton and Mammoth RX, Inc.*

**GLASSCOCK, Vice Chancellor**

This matter involves a complex contractual scheme for delivery of a straightforward product—latex gloves. The contract at issue was meant to safeguard payment for the gloves: to simplify, the Plaintiff, BAM International, LLC, ("BAM" or the "Plaintiff") is the middleman obligated to deliver gloves to a third-party purchaser; it contracted with non-parties Universal SNL Trading SDN BHD and Universal SNT Marketing SDN BHD (together, "Universal"), Malaysian manufacturers, to supply the gloves; it deposited the purchase price with an escrow agent, Defendant The MSBA Group Inc. ("MSBA" or the "Escrow Agent"), pursuant to an escrow agreement that obligated MSBA to return the money if the delivery failed, and that made Defendant Mammoth RX, Inc. ("Mammoth"), a Delaware corporation, guarantor of that obligation.

As it turned out, per the Plaintiff, delivery failed;[1] the money in escrow was nonetheless dispersed to Universal; and the Plaintiff has not been reimbursed by MSBA or Mammoth, as the contract allegedly requires. This action seeks to impose liability upon Mammoth and MSBA for breach of contract. The Complaint also alleges an equitable claim against MSBA as Escrow Agent. Additionally, and pertinent here, the Plaintiff seeks to impose liability upon two Mammoth officers for the tort of interference with the escrow agreement.

---

[1] The Complaint also alleges that BAM's right to a third-party inspection of the product was not consummated.

The instant issue before me is jurisdictional: can these individual Defendants, Ryan Hilton and Amir Asvadi (allegedly Mammoth's CEO and CFO, respectively) be haled into a Delaware court to answer for a contract-related claim, despite having no relationship with Delaware other than their status as officers of a Delaware entity? Mammoth's principal place of business is California, I note, and the escrow contract at issue was performed in Utah, where MSBA is domiciled. Hilton and Asvadi have moved to dismiss under Court of Chancery Rule 12(b)(2); this Memorandum Opinion addresses that motion.

In contesting the motion, the Plaintiff relies in part on Delaware's implied fiduciary consent statute, 10 *Del. Code* Section 3114(b).[2] Pursuant to that law, officers (and directors under subsection 3114(a)) of Delaware corporations are deemed to have consented to personal jurisdiction in this state in two situations: for actions alleging breach of their duty to the corporation and its stockholders; or where litigation is brought in Delaware involving the corporation, to which the officer is a necessary or proper party. These two legs could make a misshapen beast, with one small limb—consent to jurisdiction for redress of breaches of duty owed to the company—and one limb vastly greater, encompassing *any* litigation where the company is a party and the officer is at least a proper party defendant. The incongruity of the potential fiddler-crab-like consent scheme created by the statute

---

[2] 10 *Del. C.* § 3114(b).

has not gone unnoticed by our courts.[3]  Our Supreme Court has found, however, that any resulting unfairness is remedied by the necessity that application of Delaware jurisdiction must comply not only with the statute, but with the minimum contacts standard of constitutional due process.[4]

Here, the Complaint alleges that Mammoth breached a commercial contract with no relationship to Delaware other than a choice of law and forum, and concedes that the Moving Defendants are not parties to that contract; nonetheless, they are proper parties to this action seeking redress for their alleged tortious interference with the contract.[5]  Accordingly, Section 3114 is satisfied.  However, I find that due process is not satisfied, given the nature of the action and the paucity of the Moving Defendants' contacts with this state.  I also find that they are not bound by the contractual Delaware forum clause of the Escrow Agreement.  As a result, the Motion to Dismiss for failure of personal jurisdiction is granted.

My reasoning follows a fuller statement of the relevant background, below.

---

[3] *Cf. Armstrong v. Pomerance*, 423 A.2d 174, 176 n.5 (Del. 1980) (explaining that Section 3114 authorizes jurisdiction only in actions which are inextricably bound up in Delaware law and where Delaware has a strong interest); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 287 (Del. 2016) ("[I]t is also understood that blanket judicial invalidation of a statute's words should not ensue if the statute can be applied constitutionally in a wide class of cases, but might operate overbroadly in some more limited class of cases.").
[4] *Hazout*, 134 A.3d at 291.
[5] Not before me is the question of whether a tortious interference action will lie against corporate fiduciaries under these facts.  *See generally Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872 (Del. Ch. 2009).

# I. BACKGROUND

*A. The Parties and Certain Non-Parties*

BAM is a Delaware corporation[6] that contracted with certain other parties to this suit in 2020.[7] Those contracts and alleged breaches thereof give rise to the claims before me.

The defendants include MSBA, a Utah corporation; Mammoth, a Delaware corporation; Ryan Hilton ("Hilton"), the CEO of Mammoth; Amir Asvadi ("Asvadi" and together with Hilton, the "Moving Defendants"), an individual employed by Mammoth;[8] and Miles Stephen Bown, an individual and the principal of MSBA (collectively, the "Defendants").[9] Mammoth's principal place of business is in California.[10]

Crowley Government Services ("Crowley") is an intervenor-plaintiff in this matter.[11]

---

[6] I note that although the party name is "BAM International, LLC", the Complaint indicates that BAM is a Delaware corporation. *See* Verified Compl. for Breach of Contract, Breach Fiduciary Duties, Declaratory J., Tortious Interference, and Fraud, at 1, ¶ 13, Dkt. No. 1 [hereinafter "Compl."]. I have followed the Complaint's lead in this matter.

[7] *See generally* Compl. ¶ 15.

[8] Asvadi's role at Mammoth is subject to some dispute. *See* Opening Br. Supp. Mot. to Dismiss of Ryan Hilton and Amir Asvadi, Ex. B, Dkt. No. 18 [hereinafter "OB"] (asserting that Asvadi is not currently and never has been an officer of Mammoth as of April 2021); *but see* Pl.'s Answering Br. Opp'n Defs.' Mot. to Dismiss and its Submission on Equitable Jurisdiction, Ex. A, Dkt. No. 30 [hereinafter "AB"] (Statement of Information filed with California Secretary of State listing Asvadi as the chief financial officer of Mammoth as of March 5, 2021).

[9] Compl. ¶¶ 14–18.

[10] *See id.* ¶ 15.

[11] Although Crowley has filed its own complaint in this matter, I do not consider any additional indicia of jurisdiction presented in the Crowley complaint, as the Motion to Dismiss was fully

The Universal entities are Malaysian suppliers and non-parties to this action.[12]

*B. The California Lawsuit*

The instant case is brought by BAM against the Defendants. Certain of the Defendants, namely Mammoth, Hilton, and Asvadi, have filed a lawsuit (the "California Lawsuit") against BAM in the U.S. District Court for the Central District of California, seeking a declaratory judgment with respect to potential liability stemming from an escrow agreement between the parties (the "Escrow Agreement").[13] BAM took the position that the filing in California was improper,[14] as the Escrow Agreement included a forum selection clause identifying Delaware state courts as the appropriate forum for any disputes.[15] Mammoth has since dismissed its claims in the California Lawsuit, and the claims of Hilton and Asvadi have been stayed in favor of the determination of this motion.[16] The Moving Defendants represented to the California court that if personal jurisdiction exists here, they will litigate in Delaware and dismiss their claims in California.[17]

---

submitted at the time of the Crowley complaint's filing. *See* Tr. Of 9-15-21 of Oral Arg. and Partial Ruling of the Ct. on Crowley Government Services, Inc.'s Mot. to Intervene and Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction, 49:1–4, Dkt. No. 59 [hereinafter "Oral Arg."].

[12] Compl. ¶ 2.

[13] *See MammothRx, Inc. et al v. BAM Int'l, LLC.*, Civil Action No. 8:21-cv-00305-DOC-ADS (C.D. Cal. Feb. 17, 2021).

[14] AB 10.

[15] Compl., Ex. A, at 3.

[16] AB 10.

[17] *Id.*

*C. Factual Overview*[18]

## 1. The Sale and Purchase Agreement and the Escrow Agreement

BAM contracted with Crowley to sell nitrile gloves to Crowley in 2020.[19]  In return, Crowley provided BAM with advance payments "totaling over" $20 million.[20]  To fulfill the contract, BAM sought a supplier.[21]  It originally considered working directly with Mammoth, but ultimately was introduced to Universal by Mammoth, who asserted that Universal could supply the desired glove product.[22]

BAM and Universal then entered into a Sale and Purchase Agreement (the "SPA") under which BAM would pay $7.55 million in exchange for 100 million nitrile gloves.[23]  Certain conditions were to be satisfied before the money would become due under the SPA, including a right of inspection via a third party (the "Inspection").[24]  To memorialize and achieve these conditions, BAM entered into the Escrow Agreement with Mammoth, acting as guarantor for the Escrow Agreement, and with MSBA, in its capacity as escrow agent.[25]  The Escrow Agreement provided that MSBA would release the escrowed funds to Universal

---

[18] Unless otherwise noted, I draw these facts from the Plaintiff's Complaint or the briefing of the parties in connection with this motion to dismiss.  Given the posture of the case at this time, the background section should not be considered formal findings of fact.

[19] Mot. to Intervene by Crowley Government Services, Inc. 3, Dkt. No. 36 [hereinafter "Mot. to Intervene"].

[20] *Id.*

[21] *See, e.g.*, Compl. ¶ 2.

[22] *See id.*

[23] *Id.* ¶ 3.

[24] *Id.* ¶ 4.

[25] *Id.* ¶ 5.  MSBA was introduced to BAM by Mammoth and Universal.  *See id.*

upon notice from BAM that the Inspection had been successful.[26]  In the event that Universal did not permit the Inspection, or if Universal could not deliver the gloves per the requirements of the SPA, the Escrow Agent was to require the "Seller" (Universal) to return the money to BAM's bank account.[27]

The Escrow Agreement became effective on November 19, 2020.[28]  Under its express terms, the Plaintiff was to wire the total price of the contract to a Chase Bank branch in Utah within twenty-four hours of execution.[29]

### a. Negotiations

The Plaintiff's answering brief relating to the Motion to Dismiss (the "Answering Brief") provides further color regarding the SPA and Escrow Agreement negotiations, which is helpful to understand the claims against the Moving Defendants.[30]  The Plaintiff alleges that Hilton and Asvadi were "active participants" in the negotiation, structure and terms of the Escrow Agreement, which took place over email, in WhatsApp chats, and over the phone.[31]  Hilton and Asvadi participated in "hundreds" of communications with respect to the Escrow Agreement and were ostensibly responsible for negotiating the general structure of the deal,

---

[26] *Id.* ¶ 6.
[27] *Id.* ¶ 47.
[28] *Id.* ¶ 42.
[29] *See id.*, Ex. A, at 1.
[30] *See generally* AB.
[31] *Id.* at 5.

including the guarantor provision to which Mammoth ultimately agreed.[32] Additionally, the Escrow Agreement names Hilton as the individual who receives notices on behalf of Mammoth, and Hilton signed the Escrow Agreement for Mammoth.[33]

### b. The Forum Selection Clause and Governing Law

The Escrow Agreement includes the following forum selection clause in Section 11.2, curiously headed "Arbitration": "If any controversy or claim, whether based on contract, tort, statute, or other legal or equitable theory (including any claim of fraud, misrepresentation, or fraudulent inducement), arising [sic] out of this [Escrow] Agreement . . . the Parties will resolve the Dispute in State Courts in Delaware."[34] "Parties" is defined in the agreement to include BAM, MSBA, and Mammoth.[35] The Plaintiff asserts that, although the Moving Defendants are not by the plain text of the Escrow Agreement bound by the forum selection clause, it should be applied to them due to their extensive involvement in negotiating and papering the transaction.[36]

The Escrow Agreement also identifies the laws of the State of Delaware as the governing law for construction of the agreement.[37]

---

[32] *Id.* at 6.
[33] *Id.* at 13.
[34] Compl., Ex. A, at 3.
[35] *Id.* at 1.
[36] *See generally* AB 11–18.
[37] Compl., Ex. A, at 3.

## 2. The Disbursal from Escrow and the Delaware Lawsuit

BAM wired $7.55 million to the escrow account on November 24, 2020.[38] The Complaint alleges that Universal blocked the Inspection from occurring, but that on November 27, 2020, MSBA (through its principal, Bown) transferred the $7.55 million of escrowed funds to Universal regardless, without BAM's knowledge or consent.[39]

BAM alleges in the Complaint that prior to releasing the funds, MSBA through Bown "sought Mammoth's input regarding the release of funds."[40] Per Mammoth's admissions in the California Lawsuit, MSBA represented to Mammoth, prior to its release of the funds, that the Inspection had occurred and been favorable, and that the Inspection report would be released once the funds were sent to Universal by MSBA.[41] Neither MSBA nor Mammoth reached out to BAM to confirm the release of the funds, and BAM alleges that Mammoth did not object to the release "despite knowing" that BAM would not have approved of the release.[42] The funds were purportedly released on November 27, 2020.[43]

---

[38] *Id.* ¶ 44.
[39] *Id.* ¶¶ 7–8.
[40] *Id.* ¶ 54.
[41] *Id.*
[42] *Id.* ¶ 55.
[43] *Id.* ¶ 53.

BAM provided an SPA termination notice to Universal, MSBA and Mammoth on December 16, 2020.[44] That termination notice included a request that MSBA (as Escrow Agent) and Mammoth (as guarantor) refund the $7.55 million to BAM within twenty-four hours.[45] This total refund did not occur.[46]

BAM now believes there were never any gloves, and that Universal will not voluntarily return the funds.[47] Further, it alleges that most of the purloined funds were moved to a Swiss bank account maintained by the Universal CEO.[48]

BAM filed this action on March 1, 2021 against the Defendants.[49] The Moving Defendants have filed this Motion to Dismiss on the basis that they do not have sufficient contacts with Delaware to permit a finding of personal jurisdiction.[50] In support of this position, each of the Moving Defendants has submitted his own affidavit swearing to a lack of personal contact with Delaware and the lack of connection between the transaction documents (including the SPA and the Escrow Agreement) and Delaware.[51] The Moving Defendants' opening brief in this motion (the "Opening Brief") similarly avers a lack of connection between each of Hilton

---

[44] *Id.* ¶ 58.
[45] *Id.* ¶ 59.
[46] *Id.* Mammoth has agreed to provide two partial refund payments totaling $350,000, and has apparently corresponded with BAM regarding potential fake documentation and fraudulent misrepresentations by Universal following the events of November 2020. *Id.* ¶ 60.
[47] *Id.* ¶ 56.
[48] *Id.* ¶ 57.
[49] *See generally* Compl.
[50] *See, e.g.*, OB.
[51] *See id.*, Ex. A (affidavit of Hilton), Ex. B (affidavit of Asvadi).

and Asvadi with the state of Delaware at length, though it admits that Mammoth is in fact a Delaware corporation.[52]

*D. Procedural History*

The Complaint in this action was filed by the Plaintiff seeking declaratory judgment in addition to bringing breach of contract, breach of fiduciary duty, tortious interference, and fraud claims against the various Defendants.[53]  With respect to the Moving Defendants in particular, the Plaintiff (i) pleads tortious interference with the Escrow Agreement and (ii) seeks a declaratory judgment regarding the rights and obligations of the parties under the Escrow Agreement.[54]  The Moving Defendants filed their Motion to Dismiss in April 2021, and Mammoth filed its answer on the same day.[55]  After briefing on the Motion to Dismiss concluded, Crowley filed its Motion to Intervene.[56]  I heard oral argument on both motions on September 15, 2021, and granted the Motion to Intervene.[57]  This Memorandum Opinion deals solely with the pending Motion to Dismiss.

---

[52] *See generally* OB; *see also id.* at 6.
[53] *See generally* Compl.
[54] *See id.*
[55] *See* Mot. to Dismiss of Ryan Hilton and Amir Asvadi, Dkt. No. 17; *see also* Def. Mammoth Rx, Inc.'s Answer to Pl.'s Verified Compl., Dkt. No. 19.
[56] *See generally* Mot. to Intervene.
[57] *See generally* Oral Arg.

## II. ANALYSIS

The Moving Defendants seek dismissal of the action on basis of lack of personal jurisdiction. Their Opening Brief discusses the general theory of personal jurisdiction in Delaware, ultimately asserting that there is no statutory predicate for personal jurisdiction to be established here and therefore their motion should be granted.

In response, the Plaintiff identifies the Non-Resident Director and Officer Consent Statute as the statutory basis for personal jurisdiction against the Moving Defendants. It also puts forth a theory of personal jurisdiction stemming from the forum selection clause of the Escrow Agreement.[58] The Plaintiff further theorizes that estoppel arising from the filing of the California Lawsuit prevents the Moving Defendants from prevailing on their Motion to Dismiss here.[59]

I consider each of these theories, along with a discussion of the applicable personal jurisdiction law, below.

### A. Avenues for Establishing Personal Jurisdiction

The standard of review on a motion to dismiss pursuant to Rule 12(b)(2) is well-established. A plaintiff has the burden to "make out a *prima facie* case

---

[58] The Plaintiff would have me find that the Moving Defendants have waived any defense to this argument, as it was not included in their Opening Brief. *See* AB 3. However, the Moving Defendants responded to this theory in both their reply brief and at oral argument without further objection. As such, I do not consider the issue waived.
[59] *Id.* at 15–16.

establishing jurisdiction over a non-resident."[60]  Although "the court may consider

facts and evidence outside of the complaint such as affidavits and any discovery of

record[, w]hatever record the court considers is construed in the light most favorable

to the plaintiff."[61]

### 1. Personal Jurisdiction Generally

In general, to assess whether personal jurisdiction exists over non-resident

defendants, Delaware courts apply a two-step analysis, asking first whether there is

a statutory basis for jurisdiction and then inquiring into whether the exercise of

personal jurisdiction over the defendants would be consistent with due process.[62]

Parties often seek to apply Delaware's long-arm statute, but the Plaintiff has

not pled that the long-arm statute applies here.  Instead, it looks to apply the Non-

Resident Director and Officer Consent Statute (the "Consent Statute").[63]  Any non-

resident who, after January 1, 2004, serves as an officer of a Delaware corporation

is subject to personal jurisdiction "in all civil actions or proceedings brought in this

State, by or on behalf of, or against such corporation, in which such officer is a

---

[60] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000).
[61] *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *8 (Del. Ch. Oct. 31, 2013); *see also LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *10 (Del. Ch. Mar. 28, 2018).
[62] *Partners & Simons, Inc. v. Sandbox Acquisitions, LLC*, 2021 WL 3161651, at *3 (Del. Ch. July 26, 2021).
[63] 10 *Del. C.* § 3114(b).

necessary or proper party, or in any action or proceeding against such officer for violation of a duty in such capacity."[64]

Regardless of the statutory predicate for jurisdiction, so long as a statute exists that confers jurisdiction, Delaware courts then proceed to an analysis of the minimum contacts test to ensure due process.[65]

### 2. Personal Jurisdiction by Contract

Where applicable, Delaware courts can also find personal jurisdiction by dint of a contractual arrangement. "If a party properly consents to personal jurisdiction by contract, a minimum contacts analysis is not required. Of course, the party is bound only by the terms of the consent, and such consent applies only to those causes of action that are identified in the consent provision."[66] The Escrow Agreement did contain a forum selection clause.[67] To determine whether the Moving Defendants, as non-signatories (in their individual capacities) are bound to the forum selection clause, Delaware courts use a three-part inquiry, assessing (1) whether the forum selection clause is valid; (2) whether the defendant is a third-party beneficiary or is "closely related to" the contract; and (3) whether the claim arises from the defendant's standing relating to the agreement.[68]

---

[64] 10 *Del. C.* § 3114(b).
[65] *See Hazout*, 134 A.3d at 278.
[66] *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) (citations omitted).
[67] *See supra* note 34 and accompanying text.
[68] *Highway to Health v. Bohn*, 2020 WL 1868013, at *6 (Del. Ch. Apr. 15, 2020).

Where a party is considered bound to a forum selection clause, the court treats that party as having expressly consented to personal jurisdiction.[69] "An express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process," meaning that a constitutional minimum contacts analysis is no longer required.[70]

*B. The Non-Resident Director and Officer Consent Statute*

In the Complaint, the Plaintiff sought to establish personal jurisdiction over the Moving Defendants by use of the forum selection clause.[71] The Opening Brief discusses the establishment of personal jurisdiction more generally, concluding that no statutory basis for finding personal jurisdiction exists.[72] The Plaintiff, in answering, identifies the Consent Statute as an alternative basis of jurisdiction, separate from and in addition to the forum selection clause theory.[73] Its theory would have me find that Hilton, the CEO, and Asvadi, purportedly the CFO, have consented to personal jurisdiction in Delaware because they are Delaware officers as well as proper parties under the Consent Statute.[74]

The parties agree that Hilton is the CEO of Mammoth, a Delaware corporation, and is therefore an officer to whom the Consent Statute could apply.[75]

---

[69] *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019).
[70] *Id.* (quoting *Sternberg v. O'Neil,* 550 A.2d 1105, 1116 (Del. 1988), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016)).
[71] Compl. ¶ 21.
[72] *See generally* OB.
[73] *See* AB 18, 19.
[74] *See id*.
[75] *See* OB, Ex. A, ¶ 5.

Asvadi's status as the CFO of Mammoth is subject to question, but I assume without deciding for the purposes of this Memorandum Opinion that he is an officer as well.[76]

A summary of the development of our law with respect to the Consent Statute and its application is informative to my analysis.

### 1. Historical Applications of the Consent Statute

The current Consent Statute was originally enacted with respect to directors in 1977 (extended to officers as of 2004) [77] and has been characterized by courts as responsive to *Shaffer v. Heitner*, a U.S. Supreme Court case which found unconstitutional a practice previously used to secure personal jurisdiction over non-resident fiduciaries of Delaware corporations.[78]

Applying the Consent Statute while remaining mindful of constitutional due process has caused Delaware courts some amount of headache.[79] Under a plain text reading, the Consent Statute provides two avenues to establish jurisdiction over a

---

[76] During the oral argument on the motion to dismiss, I noted that I would allow jurisdictional discovery in the event the question of Asvadi's status as an officer (disputed among the parties) was a dispositive fact with respect to his motion. *See* Oral Arg. at 26:7–17. This determination is not necessary to my ultimate finding here.

[77] *See* 10 *Del. C.* § 3114(a). Section 3114(b), pertaining to officers, was approved in June 2003 and became effective January 2004. *See* Act of June 30, 2003, ch. 83, 2003 Del. Laws, sec. 3114, § 3 (codified as amended at 10 *Del. C.* § 3114(b)).

[78] *See Hazout*, 134 A.3d at 286 (Del. 2016) (citing *Shaffer v. Heitner*, 433 U.S. 186 (1977)).

[79] *See, e.g., Hana Ranch, Inc. v. Lent*, 424 A.2d 28 (Del. Ch. 1980); *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991) (questioning *Hana Ranch*'s approach); *Ryan v. Gifford*, 935 A.2d 258 (Del. Ch. 2007) (same); *Hazout*, 134 A.3d 274 (rejecting the reasoning in *Hana Ranch*).

16

Delaware director or officer: (1) actions against such parties for violations of fiduciary duties, sometimes called the "internal affairs" prong;[80] and (2) actions wherein the director or officer is a "necessary or proper party" to an action also proceeding against the corporation.

Construing the Consent Statute in 1980, the Court of Chancery in *Hana Ranch* adopted an approach that essentially read the second "necessary or proper party" prong out of application, finding that "it is the rights, duties, and obligations which have to do with service as a director of a Delaware corporation which make a director subject to personal service in Delaware . . . and not simply that he or she may be both a proper party as well as a director."[81] This narrow interpretation limited the reach of the Consent Statute and avoided any concerns about its facial constitutionality.[82]

The Court of Chancery followed *Hana Ranch* for many years, though certain opinions suggested that the "necessary or proper party" language could be reinstated with a minimum contacts analysis under *International Shoe*[83] used as the constitutional limiting factor.[84]

---

[80] *See Hazout*, 134 A.3d at 278.
[81] *Hana Ranch*, 424 A.2d at 30.
[82] *See Hazout*, 134 A.3d at 286.
[83] *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945).
[84] *See In re USACafes, L.P. Litig.*, 600 A.2d at 53 (citing *Int'l Shoe,* 326 U.S. 310); *Ryan v. Gifford*, 935 A.2d at 268 n.24 (citation omitted).

The Delaware Supreme Court did not have the opportunity to directly address the *Hana Ranch* case and its progeny until *Hazout v. Tsang Mun Ting* in 2016.[85] In doing so, the Delaware Supreme Court noted the disjunctive presentation of the Consent Statute in text, giving rise to the interpretation that "the General Assembly intended there to be two categories of cases to which directors and officers had consented to service."[86] The *Hazout* Court considered the "necessary or proper party" provision to "contain[] its own safeguards against overbreadth," as the requirement to *be* a necessary or proper party itself demanded a "close nexus between the claims involving the corporation . . . and the conduct of the nonresident fiduciary."[87] The Court also stated that the minimum contacts analysis could, as prior Court of Chancery opinions had noted, act as constitutional protection to provide due process to nonresident directors and officers.[88] The Delaware Supreme Court thus rejected the *Hana Ranch* line of caselaw and adopted a plain meaning interpretation of the Consent Statute.[89]

## 2. The Current Consent Statute Analysis, Applied

By virtue of their status as officers of a Delaware corporation, Delaware has, subject to the minimum contacts due process analysis, personal jurisdiction over the

---

[85] *See Hazout*, 134 A.3d at 289.
[86] *Id.* at 288.
[87] *See id.* at 289.
[88] *See id.* at 291.
[89] *Id.* at 286; *see also LVI Grp. Invs.*, 2018 WL 1559936, at *8.

Moving Defendants (1) where a civil action or proceeding is brought by or on behalf of, or against Mammoth, and the Moving Defendants are necessary or proper parties; or (2) in any action or proceeding against the Moving Defendants for violation of a duty as officers.[90]

The only substantive claim proceeding against the Moving Defendants in their individual capacities is for tortious interference with the Escrow Agreement.[91] This claim does not arise out of duties the Moving Defendants owed to Mammoth or its stockholders, but instead from torts allegedly committed against BAM.[92] Therefore, any application of the Consent Statute must be conditioned on the Moving Defendants' status as necessary or proper parties to the suit against Mammoth.

It is helpful to examine the cause of action against the Moving Defendants. Corporate officers are not liable for breach of contracts entered by the corporation to which they have not bound themselves personally.[93] Here, the Moving Defendants are alleged to have tortiously interfered with the Escrow Agreement among the Plaintiff, MSBA and Mammoth.[94] Such an action will not lie against a

---

[90] *See Hazout*, 134 A.3d at 277 (citing 10 *Del. C.* § 3114(b)).
[91] *See generally* Compl. The Complaint also names the Moving Defendants, cryptically, in a count seeking a declaration of the rights of the parties under the Escrow Agreement. *See id.*
[92] *Id.* ¶ 122 ("Hilton's, Asvadi's . . . tortious conduct has caused, and will continue to cause, damages and harm to BAM . . . .").
[93] *E.g.*, *Wallace v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).
[94] *See generally* Compl.

corporate officer who in such capacity causes the company to act in breach of contract:

> [E]mployees acting within the scope of their employment are identified with the [corporate] defendant [its]self so that they may ordinarily advise the defendant to breach [its] own contract without themselves incurring liability in tort . . . . This rationale is particularly compelling when applied to corporate officers as their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability.[95]

In order, I assume, to plead around this problem, the Complaint avers that the Moving Defendants "were acting in their own interests and *outside the scope of their duties to Mammoth*" at all times pertinent.[96] This statement is completely conclusory; no facts are pled to bolster this assertion. In any event, in this independent capacity, per the Complaint, the Moving Defendants caused MSBA to breach the Escrow Agreement by "causing or permitting" it to release the funds in escrow, to disregard BAM's instructions, and to breach its fiduciary duties to the Plaintiff.[97] These allegations also appear to be entirely conclusory; notably, the issue of whether a cause of action has been pled is not before me. For this jurisdictional

---

[95] *Id.* at 1182–83 (internal quotations omitted); *see also Kuroda*, 971 A.2d at 884; *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994)) (standing for proposition that a party cannot be liable for both breach of contract and for inducing that breach via tortious interference); *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019) (same); *WyPie Invs., LLC v. Homschek*, 2018 WL 1581981, at *14 (Del. Super. Ct. Mar. 28, 2018) (same).
[96] Compl. ¶ 120 (emphasis added).
[97] *Id.* ¶ 117. Curiously, the Complaint also seeks damages from the Moving Defendants for allegedly causing *Mammoth* to breach its contractual obligation to reimburse the Plaintiff for MSBA's misfeasance; the Complaint does not explain how the Moving Defendants did so outside the scope of their duties as officers of Mammoth, however. *See id.* ¶¶ 80–89.

issue, however, it is pertinent that the allegations to which the Moving Defendants are being asked to respond were, as explicitly averred in the Complaint, *not* taken in connection with their roles at Mammoth. That is, the Moving Defendants' complained-of actions were not taken in connection with the roles for which they consented to jurisdiction under Section 3114. I turn to that statutory analysis.

In order for Section 3114 to apply here, the Moving Defendants must be necessary or proper parties to the cause of action against Mammoth. A party is a "necessary" party if her rights must be ascertained and settled before the rights of the parties to the lawsuit can be determined.[98] A party is "proper" if she has a "tangible legal interest in the matter" separate from the corporation's,[99] and if the claims against her arise out of the same facts and occurrences as the claims against the corporation.[100]

The Moving Defendants are proper parties under this construction. The claim against Hilton and Asvadi as individuals for tortious interference establishes tangible legal interests in the lawsuit separate from those of Mammoth, although they arise out of the same set of alleged facts. Thus, the Consent Statute is a proper statutory basis for finding that Delaware courts have jurisdiction over the Moving Defendants.

---

[98] *See LVI Grp.*, 2018 WL 1559936, at *8 (citing *Hazout*, 124 A.3d at 289).
[99] *Id.* (citing *Hazout,* 124 A.3d at 292).
[100] *Hazout*, 124 A.3d at 292.

21

Before concluding that Delaware has personal jurisdiction over the Moving Defendants, I must conduct the minimum contacts constitutional check on due process. The Delaware Supreme Court in *Hazout* identified the minimum contacts test as the appropriate method for ensuring that the Consent Statute did not confer overbroad personal jurisdiction.[101] Ultimately, in *Hazout*, the Delaware Superior Court found (and the Delaware Supreme Court affirmed) that Hazout had accepted duties under Delaware law by accepting a position as a fiduciary of the corporation, which the state of Delaware had an interest in enforcing.[102] The underlying transaction giving rise to claims against Hazout involved a change in corporate control, bolstering the finding that personal jurisdiction over Hazout was appropriate under the minimum contacts analysis.[103] However, the Supreme Court's opinion notes that "one can conceive of cases where applying the plain terms of the Necessary or Proper Party Provision might compromise a nonresident fiduciary's due process rights," and describes a potential example scenario in the attendant footnote:

> For example, if plaintiffs attempted to drag corporate officers and directors into Delaware by naming them as defendants in a products liability case where the products had been designed and distributed from a state other than Delaware to diverse consumers, most of whom were in states other than Delaware, the minimum contacts test would provide substantial protection. It would be constitutionally questionable, to say the least, for Delaware to exercise personal

[101] *Id.* at 291.
[102] *Id.* at 284.
[103] *Id.* at 277, 293.

jurisdiction when Delaware's status as the state of incorporation had no rational connection to the cause of action, where the conduct is governed by the laws of other states, and where there is no reason why a corporate fiduciary should expect to be named as a party at all, much less in a suit where the underlying conduct and claims have no rational connection to Delaware and provide no rational basis for Delaware to apply its own law . . . .[104]

This footnote is illustrative here, where the contract giving rise to claims is a garden-variety commercial contract, rather than one necessarily implicating Delaware interests. The Delaware Superior Court analyzed the *Hazout* footnote in *Turf Nation v. UBU Sports, Inc.*, which presented a somewhat similar factual scenario to the one at hand.[105] In *Turf Nation*, the plaintiff sought personal jurisdiction over the defendant, a Delaware officer, under both the Consent Statute and Delaware's long-arm statute.[106] The Superior Court determined that the defendant might have been a necessary or proper party to the action, but that the minimum contacts were insufficient to confer jurisdiction, emphasizing that "the Court must examine whether the exercise of personal jurisdiction is consistent with the person's constitutional expectations of due process."[107]

In assessing the *Hazout* footnote, the *Turf Nation* court noted that the plaintiff's claims were brought under the law of various states—none of which were Delaware—and that the actions purportedly giving rise to said claims occurred in

---

[104] *Id.* at 291, 291 n.60.
[105] 2017 WL 4535970 (Del. Super. Oct. 11, 2017).
[106] *See id.* at *6–*10 (considering both theories).
[107] *Id.* at *9.

multiple non-Delaware states.[108]  Further, while the plaintiff and defendant entities were each incorporated in Delaware, both principal places of business were elsewhere.[109]  Finally, the agreement at issue, which was a Manufacture and Supply Agreement, applied Georgia law, rather than Delaware law.[110]

The Superior Court found that there was thus no "rational connection to Delaware other than the place of incorporation of [the plaintiff and defendant entities]," specifying that "[t]he wrongs alleged here are either tort claims or breach of contract claims unconnected with the internal affairs or corporate governance of a Delaware corporation."[111]  It also rejected an efficiency argument made by the plaintiff, which pointed out that a second lawsuit would need to be filed if personal jurisdiction was not found.[112]  The court referred to that equitable argument as "weaken[ed]" given that the plaintiff was the one who initiated the civil action in Delaware.[113]

The reasoning of the *Turf Nation* court stands in helpful parallel to my thinking here.  In the instant case, Hilton and Asvadi were officers of a Delaware corporation (with a principal place of business in California),[114] but the action does

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *See id.*
[114] *See* Compl. ¶ 15.

24

not involve the entity's status as a corporate citizen of Delaware. As in the *Hazout* hypothetical, the contract at issue is simply commercial, and does not involve the vindication of the General Corporation Law of Delaware.[115] Similarly, the negotiation of the Escrow Agreement, though carried out by officers of a Delaware entity, does not implicate Delaware's corporate law in the manner that negotiating a change of control agreement would.[116] The Escrow Agreement was also not to be performed in Delaware, but instead in Utah, where the escrow account was located.[117] The distribution of the escrow account by the Escrow Agent, a Utah corporation, to the seller Universal, a Malaysian supplier, would not have implicated Delaware interests in any way.[118]

Delaware has no real interest in this case other than the exercise of personal jurisdiction over officers and directors, which is, in my view, insufficient in light of the constitutional due process rights owed to the Moving Defendants. As in *Turf Nation*, the only harms alleged to have been committed by the Moving Defendants sound in tort[119]—they are not fiduciary duties, nor do they implicate corporate

---

[115] *Compare Hazout*, 134 A.3d at 291 n.60 (discussing a products liability contract) *with LVI Grp. Invsts.*, 2018 WL 1559936 (discussing a change of control contract).
[116] Defs. Ryan Hilton and Amir Asvadi's Reply to Pl.'s Opp'n Defs.' Mot. to Dismiss 8, Dkt. No. 32 [hereinafter "RB"]; *see generally Hazout*, 134 A.2d 275 (finding personal jurisdiction in the context of a change of control transaction); *LVI Grp. Invsts.*, 2018 WL 1559936 (same).
[117] *See* Compl., Ex. A, at 1 (identifying a Chase bank with address in Utah as the destination for the wire).
[118] *See id.* (identifying the Escrow Agent as a Utah corporation and the Sellers as Malaysian entities).
[119] *Turf Nation*, 2017 WL 5435970, at *9.

25

governance practices. And the actions allegedly giving rise to their liability were not taken as officers of Mammoth.

Admittedly, the Delaware Supreme Court (and the *Turf Nation* court) identified the governing law of the agreement as a factor for consideration,[120] and the Escrow Agreement at hand identified Delaware law as the governing law and selected Delaware as the forum for settling associated disputes.[121] I have considered these facts, but they are not dispositive, and they do not persuade me that personal jurisdiction should be extended over the Moving Defendants here. Many commercial contracts adopt Delaware law and include Delaware forum selection clauses, as Delaware has a well-known, settled, and (at times) easy to construe body of law that can be applied by courts anywhere. No additional connection to Delaware has been alleged that signifies this choice of law provision might have had special import to the parties, or that provides a reason for the Moving Defendants to anticipate *personal* jurisdiction over them in Delaware. I conclude that the selection of Delaware as the forum for disputes and the governing body of law is not dispositive here, where the individuals against whom the forum selection and governing law clauses would be construed were not party to the contract (the

---

[120] *Hazout*, 134 A.3d at 291 n.60.
[121] *See supra* notes 34–37 and accompanying text.

Plaintiff's contention that the Moving Defendants are nonetheless bound by the contractual forum selection is addressed *infra*).

In its argument in favor of personal jurisdiction, the Plaintiff cites to this Court's decision in *Deutsch v. ZST Digital Networks, Inc*.[122] In that case, non-party corporate fiduciaries who caused a defendant corporation to violate a court order were subject to answer for contempt of court, and raised lack of personal jurisdiction as a bar.[123] The *Deutsch* court applied the Consent Statute.[124] It found that the fiduciaries were proper parties to the litigation, such that the Consent Statute provided a statutory predicate for personal jurisdiction, and then examined due process.[125] Citing *Hazout*, the court found that, as in that case, the fiduciaries were being held accountable for taking action (or failure to take action) in their roles as directors and officers of a Delaware corporation.[126] As such, they were on notice that "they could be haled into the Delaware Courts to answer for alleged breaches of the duties imposed on them by the very laws which empower[] them to act in their corporate capacities."[127] Accordingly, due process was satisfied.[128] But *Deutsch* is, for that very reason, not applicable here. The actions allegedly resulting in liability

---

[122] 2018 WL 3005822 (Del. Ch. June 14, 2018).
[123] *See id.* at *1, *11.
[124] *Id.* at *11.
[125] *Id.* at *11–*12.
[126] *Id.* at *12 (citing *Hazout*, 134 A.3d at 292).
[127] *Id.* (citing *Armstrong*, 423 A.2d at 176).
[128] *See id.*

for the Moving Defendants were, explicitly per the Complaint, taken in their individual interests "outside the scope of their duties to Mammoth."[129] Because the complained-of actions were expressly outside the scope of the Moving Defendants' corporate power as officers, and given the paucity of other contacts with Delaware, it would not comport with due process to that find minimum contacts exist with respect to the Moving Defendants here.

The Consent Statute provides a statutory jurisdictional predicate under *Hazout*, but I am not satisfied that either of the Moving Defendants' contacts with Delaware is sufficient to subject him to personal jurisdiction in Delaware courts. As such, specific personal jurisdiction cannot lie under the Consent Statute.

*C. Personal Jurisdiction Under a Forum Selection Clause*

Another avenue for finding personal jurisdiction over the Moving Defendants is establishment of personal jurisdiction under the forum selection clause. Unlike the analysis under Section 3114, above, where parties have consented contractually to jurisdiction, due process is satisfied *a priori*.[130] Importantly, neither of the Moving Defendants were parties to or signed, in an individual capacity, the Escrow Agreement that contains the clause in this case.[131] To find personal jurisdiction over a non-signatory to a transaction document containing a forum selection clause, I

---

[129] Compl. ¶ 120.
[130] *Ruggiero*, 948 A.2d at 1132 (citations omitted).
[131] *See supra* note 33 and accompanying text.

must assess the following three requirements: (1) whether the forum selection clause is valid; (2) whether the defendant is a third-party beneficiary or is "closely related to" the contract; and (3) whether the claim arises from the defendant's standing relating to the agreement.[132]

Elements (1) and (3) were not contested in the papers or at oral argument by the Moving Defendants, and for purposes of this motion I assume that they are satisfied.[133] Further, the Plaintiff has not pled that the Moving Defendants are third-party beneficiaries of the Escrow Agreement.[134] Thus, to resolve the question of personal jurisdiction, I must determine whether the Moving Defendants were "closely related" to the Escrow Agreement such that its forum selection clause should be binding upon them and such that this Court has personal jurisdiction over them. I find that the Moving Defendants were not so closely related to the Escrow Agreement as to confer personal jurisdiction. My reasoning follows.

---

[132] *See supra* note 68 and accompanying text; *but see Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 2021 WL 3630298, at \*2 (Del. Ch. Aug. 17, 2021) (declining to apply the "same-agreement rule", here referred to as element (3), for purposes of enforcing a forum selection provision against a non-signatory). *Florida Chemical* did not address the question of whether the forum selection provision was sufficient to confer personal jurisdiction over the non-signatory, and in any event, the parties have not disputed element (3) in the instant case.

[133] *See generally* RB; *see also* Oral Arg.

[134] The Plaintiff's Complaint refers to the Defendants as "parties and beneficiaries" but does not identify them as *third-party* beneficiaries or identify supporting reasoning for this statement. *See* Compl. ¶ 23.

## 1. The Closely Related Test

Delaware caselaw provides two ways in which a non-signatory to an agreement containing a forum selection clause can be "closely related" such that the clause binds the non-signatory.[135]  First, the non-signatory can receive a "direct benefit" from the agreement.[136]  Alternatively, I can find that it was "foreseeable" that the Moving Defendants would be haled into Court in Delaware.[137]  I consider each option in turn.

### a. Did the Moving Defendants Receive a Direct Benefit?

The Plaintiff's papers do not explicitly argue that the Moving Defendants received a direct benefit from the Escrow Agreement.[138]  The Plaintiff alleged that the small size of Mammoth, as a corporation, and Hilton's role as CEO and founder, led to a reasonable inference that Hilton, at least, had a "substantial" stake in Mammoth and exercised "considerable control" over the corporation, but did not expressly state that a benefit was received by Hilton as a result.[139]  At oral argument, BAM's counsel indicated that there was a "suspicion" that some of the money in escrow "may have made its way into the hands of some of the defendants," but was not able to cite to allegations in the Complaint.[140] In any event, the receipt of the

---

[135] *See Neurvana*, 2019 WL 4464268, at *1.
[136] *See id.*
[137] *See id.* at *4.
[138] *See generally* AB.
[139] Notably, Asvadi is not mentioned in this sentence.  *See id.* at 13, 13 n.7.
[140] *See* Oral Arg., 34:13–24, 35:1–2.

allegedly purloined funds by the Moving Defendants would not be a benefit from the contract, but from the *breach* of the contract.[141]

Without more, I cannot find that either of the Moving Defendants received a direct benefit from the Escrow Agreement.[142] Personal jurisdiction arising from the forum selection clause thus cannot be established under the direct benefit prong of the closely related test.

### b. Was It Foreseeable that the Moving Defendants Might Be Sued in Delaware?

Delaware caselaw applying solely the foreseeability prong of the "closely related" analysis is limited.[143] To the extent the foreseeability prong is a legitimate means to bind non-parties to a forum selection provision, the prong operates as a species of equitable estoppel, and "[w]here the facts at bar have not aligned with previous discrete applications of the standalone foreseeability inquiry, [the Court of Chancery] has declined to expand the test."[144] *Neurvana Medical, LLC v. Balt USA, LLC* provides a recent review of the foreseeability precedent, noting that the foreseeability analysis most often follows the establishment of a direct benefit, but

---

[141] *See Neurvana*, 2019 WL 4464268, at *4 (citing *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4 (Del. Ch. May 14, 2009)).
[142] *Cf. id.* ("In any event, the mere 'contemplation' of a benefit does not directly confer one.").
[143] *See id.* at *5 (identifying two scenarios where the foreseeability inquiry was a singular basis for satisfying the "closely-related" test).
[144] *See Partners & Simons*, 2021 WL 3161651, at *7.

31

identifying two factual scenarios where personal jurisdiction was established based on the foreseeability inquiry alone.[145]

The first factual scenario allows a non-signatory to *enforce* a forum selection clause against a signatory where the non-signatory is "closely related to one of the signatories such that the non-party's enforcement of the clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound."[146] For example, *Ashall Homes Ltd. v. ROK Entertainment Group Inc.* determined that officers and directors could constitute closely related non-signatories with standing to invoke a forum selection clause against a signatory.[147]

Here, the party seeking to enforce the forum selection clause was a party to the Escrow Agreement—the Plaintiff, BAM; it is the Moving Defendants who are the non-signatories. Therefore, this line of cases does not support personal jurisdiction.

*iModules Software, Inc. v. Essenza Software, Inc.* encapsulates the second factual scenario, with the Court finding that a non-signatory entity can be bound to a forum selection clause where its controllers have signed the agreement at issue.[148] The instant case does not resemble this factual scenario, either; the Moving

---

[145] *See generally Neurvana*, 2019 WL 4464268.
[146] *See Lexington Servs. Ltd. v. U.S. Patent No. 8019807 Delegate, LLC*, 2018 WL 5310261, at *5–6 (Del. Ch. Oct. 26, 2018) (quoting *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*, 992 A.2d 1239, 1249 (Del. Ch. 2010)).
[147] *See Ashall*, 992 A.2d at 1249.
[148] 2017 WL 6596880 (Del. Ch. Dec. 22, 2017) (ORDER).

Defendants are alleged to have themselves caused the signatory to act, not the other way around.

Therefore, to find personal jurisdiction by reason of foreseeability, the Plaintiff seeks to have me expand the existing caselaw. In support of its proposition, the Plaintiff cites to a Third Circuit case applying Delaware law, *Carlyle Investment Management LLC v. Moonmouth Company*.[149] *Carlyle* indicates that in conducting the foreseeability inquiry, courts should consider "the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement."[150]

The *Carlyle* Court found personal jurisdiction over the defendant via the forum selection clause, referencing the negotiations process, authority to give and receive instructions on behalf of the pertinent entities, and contact information for the entities.[151] *Carlyle* is nevertheless distinguishable from the facts at bar. In that case, the defendant and party at issue were both controlled by a common controller.[152] Thus, the determination that the forum selection clause conferred personal jurisdiction was not predicated solely on facts regarding the negotiations,

---

[149] 779 F.3d 214 (3d Cir. 2015).
[150] *Id.* at 219 (citing *Weygandt*, 2009 WL 1351808, at *4; then citing *Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *6–7 (Del. Ch. Oct. 29, 2004)).
[151] *Id.*
[152] *See id.*

contact information and authority in connection with entities.[153]  In other words, to the extent *Carlyle* is persuasive, it is not pertinent.

BAM seeks to establish personal jurisdiction over Asvadi on basis of his participation in the negotiation of the Escrow Agreement, his status as a point of contact for Mammoth following the release of the funds from escrow, and a shared address with Mammoth.[154]  The facts are slightly stronger with respect to Hilton— in addition to the above, he signed the Escrow Agreement for Mammoth in his capacity as CEO and is listed as its agent for service of process *in California*.[155]  Viewed in the light most favorable to the Plaintiff, this theory mirrors the "active-involvement" theory considered and rejected in *Neurvana*, which declined to find "active involvement in negotiating and executing the transaction" a "standalone basis" for establishing personal jurisdiction.[156]

I too decline to extend the foreseeability test in this way.  The Plaintiff has not made a *prima facie* showing that the Moving Defendants are "closely related to" the Escrow Agreement such that they should be bound by its forum selection clause.  As such, the forum selection clause does not confer personal jurisdiction over the Moving Defendants.

---

[153] *See id.* at 219; *see also Partners & Simons, Inc.*, 2021 WL 3161651, at *8.
[154] *See* AB 13.
[155] *See id.*
[156] *Neurvana,* 2019 WL 4464268, at *7 (citing *Compucom Sys., Inc. v. Getronics Fin. Holdings B.V.*, 2012 WL 4963308, at *4 (D. Del. Oct. 16, 2012)); *id.* at *8; *see also Partners & Simons, Inc.*, 2021 WL 3161651 (declining to apply the active-involvement theory).

*D. Estoppel*

Finally, the Plaintiff argues that the Moving Defendants are estopped from denying the application of the forum selection clause.[157]   Its basis is that the California Lawsuit filed by the Moving Defendants "embraced" the Escrow Agreement (for purposes of suing BAM and seeking a declaratory judgment), and that the Moving Defendants cannot now disclaim the Escrow Agreement's applicability.[158]  The California Lawsuit seeks a declaratory judgment finding each of Hilton and Asvadi *not liable on the guaranty under the Escrow Agreement*.[159] The Moving Defendants' theory in that action is that because they did not sign the Escrow Agreement in their individual capacities, they are therefore not personally bound by any of the obligations in the agreement, including the guaranty provision and, although not expressly pled in the California Lawsuit, ostensibly the forum selection clause, as well.[160]

The Plaintiff appears to argue that estoppel is its own separate basis for finding personal jurisdiction against the Moving Defendants, but as noted above, the "closely related" test is properly grounded on estoppel.  As a consequence, the Plaintiff's argument here is largely duplicative of the arguments under the closely

---

[157] AB 15.
[158] *Id.* at 15–16.
[159] *Id.*, Ex. I, ¶¶ 35–40.
[160] *Id.* at 38.

related test (and are treated as such in the caselaw to which the Plaintiff cites).[161] For example, *Capital Group Companies, Inc. v. Armour*, cited in the Answering Brief, states that "a non-signatory is estopped from refusing to comply with a forum selection clause when she receives a 'direct benefit' from a contract containing a forum selection clause."[162] The Complaint does not allege that the Moving Defendants received any direct benefit from the Escrow Agreement, nor did they seek a benefit under the Escrow Agreement in the California action. Quite the contrary, they sought prophylactic judicial recognition that they were strangers to the contract.[163] Seeking a declaratory judgment in California courts regarding liability under the Escrow Agreement is not equivalent to "embracing" a contract for the purposes of estoppel, because the Moving Defendants do not there seek to obtain a benefit, but rather seek to disclaim liability under the Escrow Agreement. This affirmative defense is therefore unavailing.

\* \* \*

I have considered each of the theories presented by the Moving Defendants and the Plaintiff in connection with the Motion to Dismiss. I find that sufficient

---

[161] *See Neurvana*, 2019 WL 4464268, at \*3 ("Decisions of [the Court of Chancery] have described the closely-related test as an application of the doctrine of equitable estoppel.").

[162]*Capital Grp.*, 2004 WL 2521295, at \*6 (citations omitted); *see also Neurvana*, 2019 WL 4464268, at \*3 (quoting *Plaze, Inc. v. Callas*, 2019 WL 1028110, at \*8 (Del. Ch. Feb. 28, 2017)) ("Equitable estoppel exists 'to prevent someone from accepting the benefits of a contract without accepting its obligations.'").

[163] *See generally* AB, Ex. I.

36

minimum contacts do not exist between the Moving Defendants and the State of Delaware to satisfy due process.  Further, I do not find that the Moving Defendants were so closely related to the Escrow Agreement as to be contractually bound by its forum selection clause.  Finally, I do not find that estoppel prevents the Moving Defendants from prevailing on the Motion to Dismiss.  In total, none of the theories advanced by the Plaintiff is sufficient to confer personal jurisdiction over the Moving Defendants.

## III. CONCLUSION

The Motion to Dismiss with respect to the Moving Defendants is GRANTED. The parties should submit an appropriate form of order.