**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

ALEX BROLA, derivatively on behalf of CREDIT GLORY INC., a Delaware corporation,

        Plaintiff,

        v.

CHRISTOPHER LUNDGREN,

        Defendant.

C.A. No. 2024-1108-LWW

## OPINION

Date Submitted: August 5, 2025
Date Decided: December 1, 2025

Joseph L. Christensen, Anne M. Steadman, CHRISTENSEN LAW LLC, Wilmington, Delaware; *Attorneys for Plaintiff Alex Brola*

Christopher Lundgren, New York, New York; *Defendant, Pro Se*

**Will, Vice Chancellor**

This case invites the court to erase the boundary between employment law and corporate governance.

The defendant, a director and former officer of a closely held corporation, sexually harassed two employees. His actions were abhorrent. It led to his termination and to monetary judgments against both him and the company in New York state court.

The plaintiff, a stockholder and fellow director, seeks to extract a second recovery—this time under an expansive theory of fiduciary duty. He argues that because sexual harassment is selfish and unlawful, it is a per se breach of the duty of loyalty.

Delaware law does not reach so far. The defendant's misconduct was interpersonal, not a matter of corporate internal affairs. The legal system provided a remedy for his wrongdoing through New York's employment laws. This court cannot—and should not—supply a second one.

## I.    BACKGROUND[1]

Credit Glory Inc. (the "Company") is a private Delaware corporation that assists subscribers in disputing credit report inaccuracies.[2] Its sole stockholders and

---

[1] The factual background is drawn from the complaint and the documents it incorporates by reference. Verified Compl. (Dkt. 1) ("Compl.").

[2] *Id.* ¶¶ 5, 7.

1

directors are plaintiff Alex Brola and defendant Christopher Lundgren.[3]  Brola is a cofounder of the Company and serves as its President.[4]  Lundgren is the Company's former Vice President and Secretary.[5]

Lundgren allegedly "used his positions at the Company to sexually harass its employees and expose them to his reprehensible racist views and conduct" in violation of positive law and Credit Glory policies.[6]  One employee was repeatedly sent offensive sexual messages and demands, promoted, then excluded from communication channels and a meeting after rebuffing Lundgren until she resigned.[7]  Another was repeatedly sent degrading comments and inappropriate requests that also led to her resignation.[8]  The former employees filed successful charges with the Equal Employment Opportunity Commission (EEOC), and lawsuits in New York state court followed.[9]  The suits led to judgments totaling over $1.8 million: approximately $1.35 million against the Company and Lundgren jointly, and over $235,000 against the Company and Lundgren each individually.[10]

---

[3] *Id.* ¶¶ 3-4.

[4] *Id.* ¶¶ 3, 7.

[5] *Id.* ¶¶ 4, 21.

[6] *Id.* ¶ 1; *see also id.* ¶¶ 18-59.

[7] *Id.* ¶¶ 27-38; Compl. Ex. A.

[8] *Id.* ¶¶ 41-57; Compl. Ex. B.

[9] *Id.* at Exs. A, B; *id.* ¶¶ 39, 58.

[10] *Id.* ¶¶ 40, 59.

Brola seeks to hold Lundgren liable to the Company for those judgments and other losses on the theory that Lundgren's actions breached his duty of loyalty. He asserts that Lundgren breached his fiduciary duty by "[a]cting in pursuit of his own personal interests and gratification, and contrary to the best interests of the Company."[11]

## II.     ANALYSIS

Lundgren, acting pro se, moves to dismiss this suit on procedural and substantive grounds, primarily relying on Court of Chancery Rules 12(b)(2), 12(b)(6), and 23.1.[12] He argues that this court lacks personal jurisdiction, that the complaint fails to plead demand futility or damages, that the claims are time-barred,

---

[11] *Id.* ¶ 66; *see id.* ¶ 67.

[12] *See* Opening Br. in Supp. of Def.'s Mot. to Dismiss (Dkt. 23) ("Def.'s Opening Br."); *see also* Br. in Opp'n to Def.'s Mot. to Dismiss the Verified Compl. (Dkt. 28) ("Pl.'s Opp'n Br."). A hearing was held on August 5, 2025, at which Lundgren orally presented his reply to Brola's opposition brief. *See Govette v. Elec. Referral Manager, Inc.*, 2021 WL 2311956, at *2 (Del. Ch. June 7, 2021) ("Delaware judges traditionally (and naturally) treat self-represented individuals with some degree of latitude when it comes to procedure in order to do justice on the merits."); *see also* Letter Explaining Late Filing (Dkt. 24).

and that Brola is an inadequate derivative plaintiff.  My analysis begins with personal jurisdiction and ends with the absence of a cognizable claim.

### A.    Personal Jurisdiction

I first address the threshold jurisdictional inquiry.[13]  "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[14]  The plaintiff must "demonstrate the two bedrock requirements for personal jurisdiction: (1) a statutory basis for service of process; and (2) the requisite 'minimum contacts' with the forum to satisfy constitutional due process."[15]  The plaintiff "need only make a prima facie showing of personal jurisdiction, and the record is construed in the light most favorable to the plaintiff."[16]

Brola cites 10 *Del. C.* § 3114(a) as the basis for personal jurisdiction over Lundgren, a director of Credit Glory.[17]  Section 3114(a) provides that a nonresident who accepts appointment as a director of a Delaware corporation is deemed to have

---

[13] *See, e.g.*, *Gibralt Cap. Corp. v. Smith*, 2001 WL 647837, at *5 (Del. Ch. May 9, 2001) (describing personal jurisdiction as a "threshold issue").

[14] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[15] *Fish Ventures, LLC v. Segal*, 2008 WL 1961156, at *6 (Del. Ch. May 7, 2008) (citation omitted).

[16] *Ryan*, 935 A.2d at 265 (citation omitted).

[17] Pl.'s Opp'n Br. 3-7; *see* Compl. ¶ 6.  Lundgren was served under Section 3114 by serving Credit Glory's registered agent, Credit Glory's principal place of business, and Lundgren's last known address.  *See* Dkts. 3, 6, 8; 10 *Del. C.* § 3114(c); *Actrade Fin. Techs. Ltd. v.*

consented to the appointment of the registered agent of such corporation (or, if there is none, the Secretary of State) as an agent upon whom service of process may be made [(1)] in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director . . . is a necessary or proper party, or [(2)] in any action or proceeding against such director . . . for violation of a duty in such capacity[.][18]

Because Brola claims that Lundgren breached the duty of loyalty he owed to Credit Glory as an "officer and director,"[19] the second clause of Section 3114(a) is satisfied.[20]

Exercising personal jurisdiction over Lundgren also comports with due process.[21] Section 3114 "provided explicit notice to [Lundgren] that, by accepting a position as a director and officer of a Delaware corporation, he consented to appear in this state to defend claims" accusing him of violating "a duty in such capacity."[22]

---

*Aharoni*, 2003 WL 22389891, at *4-5 (Del. Ch. Oct. 17, 2003) (holding that service under Section 3114 was accomplished upon service on the company's Delaware registered agent).

[18] 10 *Del. C.* § 3114(a).

[19] Compl. ¶¶ 65-67.

[20] *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 52 (Del. Ch. 1991) (describing the "two bases to assert jurisdiction" under Section 3114(a) and that "if the action alleges a violation of the director's duties in her capacity as a director, the latter clause of the statute is satisfied"); *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 292 (Del. 2016) (describing the "Internal Affairs Claims Provision" of Section 3114 as addressing "claims against nonresident fiduciaries of Delaware corporations for internal affairs claims *involving an argument* that they breached statutory or fiduciary duties they owed to the corporation or its stockholders" (emphasis added)).

[21] *Hazout*, 134 A.3d at 290.

[22] *Id.*

And since the wrongs "are alleged breaches of fiduciary dut[y] . . . it would constitute no offence to traditional notions of fairness to require those who have chosen to serve as directors of [a corporation] to defend their actions here."[23]

Lundgren argues otherwise because his actions were in furtherance of a "purely personal, non-corporate objective."[24] This argument targets the intersection of constitutional due process and the merits. Brola alleges that Lundgren exploited his supervisory authority to harass subordinates—a power that purportedly derives from his positions as a Credit Glory director and officer.[25] Whether that alleged abuse of power states a claim for breach of fiduciary duty, rather than a personal harm, is a merits question. Lundgren's alleged use of his corporate seat to carry out the challenged acts satisfies due process.[26]

## B.    Demand Futility

The threshold substantive inquiry is whether Brola has derivative standing to press his claims on behalf of Credit Glory without first demanding that its Board of

---

[23] *USACafes*, 600 A.2d at 52; *see also Hazout*, 134 A.3d at 292 ("By becoming a director and officer of a Delaware corporation, [the defendant] purposefully availed himself of certain duties and protections under our law.").

[24] Def.'s Opening Br. 8-9.

[25] Compl. ¶¶ 18-59; *see id.* ¶¶ 65-66.

[26] *See Hazout*, 134 A.3d at 293 (finding due process satisfied where claims involved the defendant's "actions in his official capacity" regarding a corporate transaction); *cf. BAM Int'l, LLC v. MSBA Gp. Inc.*, 2021 WL 5905878, at *11 (Del. Ch. Dec. 14, 2021) (dismissing claims against officers under Rule 12(b)(2) where the conduct was explicitly alleged to be "outside the scope of their duties").

Directors act.[27]  The Board has two members: Lundgren and Brola.  To establish demand futility, Brola need only show that one director is disabled.[28]

A director cannot exercise his independent judgment on a litigation demand if he is "influenced by the . . . personal consequences resulting from the decision" or other "extraneous considerations."[29]  Here, it is hard to see how Lundgren could "bring [his] impartial business judgment to bear."[30]  The claim details Lundgren's own transgressions, which led to substantial monetary judgments against him.[31]  He is far from impartial on the subject.

Yet a strict application of the *Zuckerberg* test yields a counterintuitive result.[32]  As Brola concedes, any disabling conflict rests only on the second prong: whether

---

[27] *See Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("[T]he requirement of [Court of Chancery] Rule 23.1 exists at the threshold to prevent abuse and to promote intercorporate dispute resolution."), *overruled on other grounds by*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[28] *See United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021); Ct. Ch. R. 23.1.

[29] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[30] *Zuckerberg*, 262 A.3d at 1059 ("The purpose of the demand futility analysis is to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand.").

[31] Compl. ¶¶ 40, 59.

[32] *Zuckerberg*, 262 A.3d at 1059 (articulating a three-part demand futility test that examines: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and (iii) whether the director lacks independence from someone who

7

Lundgren faces a substantial likelihood of liability.[33]  That inquiry depends on the viability of the underlying claim.  If the complaint fails to state a claim, Lundgren faces no threat of liability, and demand is not excused.[34]  I therefore proceed to the merits and conclude that the claim Brola advances cannot stand.

## C.    Non-Cognizable Claim

The core issue is whether corporate law can be broadened to encompass interpersonal workplace disputes.  It cannot.  Delaware law governs internal affairs—the discretionary management of business assets, oversight of enterprise-level risks, and fulfillment of the fiduciary promise.[35]  External relationships between managers and employees, by contrast, are often governed by the substantive

---

received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand”); *see also Cent. Laborers' Pension Fund v. Karp*, 2025 WL 1213104, at *21 (Del. Ch. Apr. 25, 2025) (observing that the *Zuckerberg* test is not meant to be rigidly applied).

[33] *See Zuckerberg*, 262 A.3d at 1059 (requiring an analysis of liability “on any of the claims that would be the subject of the litigation demand”); *id.* at 1060 (explaining that only non-exculpated claims for breach of fiduciary duty were relevant to the demand futility analysis).

[34] A reasonably conceivable claim is necessary to satisfy the second prong of *Zuckerberg*, but it is not sufficient.  That is because the pleading standards under Rules 23.1 and 12(b)(6) are different.  To show demand futility under Rule 23.1, a plaintiff must plead with factual particularity that directors face a substantial likelihood of liability.  *See In re INFOUSA, Inc. S'holders Litig*, 953 A.2d 963, 985 (Del. Ch. Aug. 13, 2007).  Rule 12(b)(6), by contrast, requires only non-conclusory allegations to support a reasonably conceivable claim.  *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[35] *See Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1984), *overruled on other grounds by*, *Brehm*, 746 A.2d at 244; 8 *Del. C.* § 141(a).

8

law of the jurisdiction where the injury occurs or by applicable statutes.[36] Brola's attempt to conflate these distinct legal regimes must be rejected.

##### 1. The Absence of Fiduciary Conduct

Delaware law polices the integrity of the corporate decision-making process. The duty of loyalty ensures that fiduciaries exercise corporate authority with undivided allegiance to the corporation and its stockholders. It guards against self-dealing, conflicted transactions, and bad faith conduct.[37] Bad faith comprises both "[f]iduciary conduct motivated by an actual intent to do harm" and "intentional dereliction of duty."[38] The doctrine is "exacting, but narrow."[39]

---

[36] *See Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 987 (Del. 2013) (explaining that the Restatement (Second) of Conflict of Laws "creates a strong presumption that the 'law of the state where the injury occurred' governs unless another state 'has a more significant relationship'" (quoting Restatement (Second) of Conflicts of L. § 146) (A.L.I. 1971))); Restatement (Second) of Conflicts of L. § 145(1) (A.L.I. 1971); *id.* § 6(2); *e.g.*, 42 U.S.C. § 2000e-5; N.Y. Exec Law §§ 296-97 (McKinney 2025).

[37] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983); *Guth v. Loft, Inc.*, 5 A.2d 503, 510-12 (Del. 1939).

[38] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64, 66 (Del. 2006); *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (describing subjective bad faith as "fiduciary conduct motivated by an actual intent to do harm" and "intentional dereliction of duty, a conscious disregard for one's responsibilities" (citation omitted)); *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) (explaining that, in the oversight context, the "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations").

[39] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016) ("The duty of loyalty under which a corporate director must act is exacting, but narrow.").

Brola distorts the meaning of bad faith beyond recognition, seeking to transform it into a general morality code. His argument rests on *In re McDonald's Corp.*, where the court sustained a claim for breach of the duty of loyalty against a corporate officer accused of sexually harassing employees.[40] But that decision—whatever its outer bounds—did not create a rule that a viable breach of fiduciary duty claim arises whenever an officer engages in unlawful harassment.[41]

In *McDonald's*, the defendant was a senior officer charged with maintaining a safe and respectful workplace at the enterprise level. The court held that he conceivably breached his duty of loyalty by failing to oversee that function and by

---

[40] *In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 351 (Del. Ch. 2023); *see also In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 701 (Del. Ch. 2023) (subsequently dismissing the suit on demand futility grounds).

[41] Nor does any other Delaware case. *See Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *25 (Del. Ch. Feb. 25, 2019) (holding that a director's "troubling" and "imprope[r]" retaliation against employees who complained of harassment did not breach the duty of loyalty because the conduct, though directed at the employees, was not motivated by an intent to harm the corporation or obtain a personal financial benefit); *id.* at *35 n.299 (observing that "[n]o authority applying Delaware law has been brought to the court's attention addressing a breach of fiduciary duty claim based on allegations of retaliation against employees" and noting a New York decision holding that sexual harassment allegations do not state a claim for breach of the duty of loyalty (citing *Pozner v. Fox Broad. Co.*, 74 N.Y.S.3d 711, 713-14 (N.Y. Sup. Ct. 2018))). Brola also cites a books and records decision, *Espinoza v. Hewlett-Packard Co.*, but it provides no support for his claim. 2011 WL 941464, at *5, *10 (Del. Ch. Mar. 17, 2011) (describing a document about a former officer's sexual misconduct as "a business communication concerning how and why [the officer] allegedly breached his fiduciary duties to HP stockholders" where the mismanagement involved "misuse of corporate funds" and "leaking of potential[ly] material nonpublic information").

10

engaging in acts that subverted it.[42]  His personal misdeeds were framed by the corruption of the corporate mission he was entrusted to lead.[43]

Still, fiduciary liability is not a catch-all for every wrong committed in the workplace simply because the perpetrator happens to hold a title.  Egregious interpersonal misconduct, even when violative of employment law and company policy, generally falls outside the scope of Delaware corporate law.  This case highlights the importance of that distinction.

Lundgren is not alleged to have abused the specific delegated authority of his corporate office.[44]  None of the factual allegations in the complaint concern fiduciary conduct taken in Lundgren's capacity as a director or the Company's Secretary.  Instead, his wrongdoing—sending harassing communications, using racial slurs, excluding subordinates from meetings, and threatening termination—relied on his general authority as a supervisor.[45]  However deplorable, his harassment and bigotry

---

[42] *See McDonald's*, 289 A.3d at 350 (noting the officer's "day-to-day responsibility for the department charged with promoting a safe and respectful workplace"); *id.* at 370 (stating that liability arises regarding matters "within [the officer's] responsibility"); *id.* at 381.

[43] *Id.* at 378-79; *see also Segway Inc. v. Cai*, 2023 WL 8643017, at *4-5, *4 n.55 (Del. Ch. Dec. 14, 2023) (describing *McDonald's* as predicated on "extreme facts": the officer allegedly ignoring "massive red flags" about "multiple rounds of coordinated EEOC complaints, widespread strikes, and a thirty-city walkout").

[44] *Cf. Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *13 (Del. Ch. July 12, 2010) (discussing officers' "contextual obligations as fiduciaries" including disclosing to their principal "material information relevant to the affairs of the agency entrusted to them" (citation omitted)).

[45] *See supra* notes 7-9 and accompanying text (citing Compl. ¶¶ 27-57; *id.* at Exs. A, B).

were personal malfeasance, not a misuse of his corporate office.[46] Any midlevel manager could commit the same wrongs using the same means.[47]

Adopting Brola's theory would undermine the principled distinction between interpersonal harms and fiduciary breaches. A literal application of the syllogism he draws from *McDonald's*—that because sexual harassment is selfish, and selfishness is disloyal, then harassment is a breach of the duty of loyalty—would impose strict fiduciary liability for workplace misconduct.[48] That logic lacks a limiting principle. If every self-serving, reprehensible act by an officer constitutes fiduciary disloyalty, then a breakroom fistfight, a defamatory social media post, or theft of office supplies becomes an internal affairs matter. Delaware law does not support this expansion.[49]

---

[46] *See* Def.'s Opening Br. 8 ("Actions taken for 'personal gratification' are, by their nature, not corporate acts. They are not business decisions made, however wrongly, for the purported benefit of the corporation. They are personal torts."); *id.* at 9 (describing his actions as "purely personal," a "personal tort," and relating to "personal sexual demands").

[47] Lundgren's alleged violation of Credit Glory's code of conduct does not require a different outcome. *See* Compl. ¶¶ 11-18. Compliance with workplace policies is an employment obligation enforced through internal personnel systems and external statutes. Failed compliance does not, by itself, support a breach of fiduciary duty claim. *See Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *7 & n.57 (Del. Ch. Feb. 22, 2006).

[48] Pl.'s Opp'n Br. 9-11; *see McDonald's*, 289 A.3d at 351 ("When engaging in sexual harassment, the harasser engages in reprehensible conduct for selfish reasons. By doing so, the fiduciary acts in bad faith and breaches the duty of loyalty.").

[49] *See supra* note 41, *infra* notes 52-53, and accompanying text; *see also* Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 COLUM. L. REV. 1583, 1668 (2018) (discussing a concern that using corporate law to regulate sexual harassment "stretch[es] [c]orporate [l]aw [b]eyond [i]ts [l]imits" and "divert[s]" it from its "core mission" of maximizing value). To the extent *McDonald's* suggests that any act of sexual harassment by any officer is per se a breach of the duty of loyalty, I decline to extend that

12

## 2. Preemption, Comity, and Public Policy

There are several reasons, aside from the risk of doctrinal sprawl, to reject Brola's invitation to place workplace misconduct under the banner of fiduciary duty.

First, employment disputes are regulated by comprehensive state and federal laws that reflect careful legislative choices. Federal law provides robust remedies for victims of harassment but imposes strict procedural guardrails to promote business stability and encourage conciliation, such as mandatory administrative exhaustion with the EEOC, short statutes of limitations, and damages caps.[50] Even in New York, where the statute of limitations for sexual harassment is three years and damages are uncapped, the legislature has defined the specific remedies and procedures available to victims.[51] Permitting derivative claims for the same conduct would authorize an end-run around these statutory frameworks, allowing stockholder plaintiffs to bypass requirements that bind actual victims.

---

reasoning here. *See, e.g.*, *In re IBP, Inc.*, 793 A.2d 396, 408 n.34 (Del. Ch. 2002) ("[U]nappealed trial court decisions . . . derive whatever precedential force they have largely from their own persuasiveness, except as to parties bound by the decision."), *aff'd sub nom.*, *Tyson Foods, Inc. v. Aetos Corp.*, 818 A.2d 145 (Del. 2003).

[50] *See* 42 U.S.C. § 2000e-5(e)(1) (setting out the process for filing a charge with the EEOC within a specific timeframe, typically 300 days); 42 U.S.C. § 1981a (outlining compensatory and punitive damages); 42 U.S.C. § 1981a(b)(3) (specifying limits on the compensatory and punitive damages an individual can recover based on employer size).

[51] *See* N.Y. Exec. Law §§ 296-97 (McKinney 2025).

Second, the internal affairs doctrine and comity principles underlying it foreclose Brola's attempt to recast employment disputes as breaches of fiduciary duty. Under that doctrine, Delaware law governs the relationships between corporate owners and managers.[52] It does not reach interpersonal matters occurring within other states' borders.[53]

Third, treating sexual harassment-based claims as corporate assets creates perverse incentives. It risks commodifying personal trauma, forcing it into public derivative litigation that lacks the privacy protections of employment statutes.[54]

---

[52] *See Salzberg v. Sciabacucchi,* 227 A.3d 102, 127 (Del. 2020) (observing that "corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property," but "[i]nternal corporate affairs," which involve matters "peculiar to the relationship among or between the corporation and its current officers, directors, and shareholders" (quoting *McDermott v. Lewis*, 531 A.2d 206, 214-15 (Del. 1987))); *McDermott*, 531 A.2d at 214-15 (explaining that the "internal affairs doctrine has no applicability" in cases about acts that can be performed by "[c]orporations and individuals alike"); *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) (reiterating that the internal affairs doctrine concerns relationships among or between the entity and its officers, directors, and stockholders, and that state of incorporation's law governs the "entire gamut of internal corporate affairs" (citation omitted)).

[53] *See, e.g.*, *Salzberg*, 227 A.3d at 124 (distinguishing "internal" corporate claims from "external" claims, such as "a tort claim for personal injury suffered by the plaintiff on the premises of the company or a contract claim involving a commercial contract"); *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1052 (Del. 2015) ("Each sovereign is entitled to conduct its own cost-benefit analysis to determine the appropriate balance between compensating victims and fostering commercial activity within its borders. . . . [and] comity requires us to respect the balance established by those states.").

[54] Unlike oversight claims, which turn on board-level records and institutional failures, harassment claims require fact-intensive evidence of a victim's experience. Permitting these claims to proceed would force victims to testify in a public commercial forum, without the privacy and conciliation mandates central to employment law.

Equity must not sanction collateral litigation that exposes victims to unwanted scrutiny in the service of a corporate recovery and attorneys' fees.

*      *      *

The legal system worked as intended. Victims sued in New York to vindicate their interests and obtained substantial judgments against a New York resident and a New York-based company.[55] Those proceedings confirm that the remedy for Lundgren's behavior lies in tort and employment law, not corporate doctrine.[56] To sustain Brola's claim would impose a precarious layer of fiduciary liability onto comprehensive legal frameworks and convert this court of equity into a general workplace disciplinary forum, adjudicating matters well beyond its purview.[57]

---

[55] Compl. ¶ 4 (stating that Lundgren is a New York resident); *id.* ¶¶ 39-40, 58-59; *id.* at Exs. A, B (making charges on behalf of victims in New York and Georgia); *see also Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46-47 (Del. 1991) (holding that the Restatement's most significant relationship test governs tort claims); *supra* note 36.

[56] Nor is a derivative claim necessary for Credit Glory to recover since there are insurance and contribution structures designed for such employment-related risk. *See Cas. Co. v. Forge Indus. Staffing Inc.*, 567 F.3d 871, 876 (7th Cir. 2009) (discussing that an employment practices liability insurance "policy provides [the defendant corporation] liability coverage for intentional acts, including intentional torts such as intentionally discriminating against one of its employees"); *see also White v. Panic*, 783 A.2d 543, 553-55 (Del. 2001) (affirming dismissal of derivative claim alleging board waste for settling sexual harassment suits against the CEO, and noting that settlements are routine business decisions entitled to deference).

[57] *Cf. Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 730 (Del. Ch. 2023) (remarking that Delaware must not adjudicate employment disputes "for the country" because "the Delaware franchise depends on other states deferring to Delaware law to govern the internal affairs of the entities that Delaware charters [and] Delaware risks jeopardizing that deference if Delaware accommodates efforts to use the internal governance documents of

## III.  CONCLUSION

Lundgren does not face a substantial likelihood of liability on the fiduciary duty claim raised by Brola.  No cognizable claim under Delaware law is presented. The motion to dismiss is therefore granted and the complaint is dismissed with prejudice.

---

its entities to override the law of other states on issues of great importance to them"), *aff'd in part, rev'd in part on other grounds*, 332 A.3d 472 (Del. 2024).